Bradley M. Parsons, Esq. (BP8305)
**KROLL HEINEMAN PTASIEWICZ & PARSONS, LLC**
91 Fieldcrest Avenue, Suite 35
Edison, New Jersey 08837
Tel: (732) 491-2100
Fax: (732) 491-2120
*Attorneys for Petitioners*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EASTERN ATLANTIC STATES CARPENTERS BENEFIT FUNDS as successors to KEYSTONE MOUNTAIN LAKES REGIONAL COUNCIL OF CARPENTERS and the TRUSTEES THEREOF, | ) Hon. <br><br> ) Civil Action No. 23- <br><br> ) **CIVIL ACTION** |
| Petitioners, | ) **PETITION TO CONFIRM** <br> ) **ARBITRATION AWARD AND ENTRY** <br> ) **OF JUDGMENT** |
| v. | ) |
| KBD CONSTRUCTION LLC, | ) |
| Respondents. | ) |

Petitioners, Eastern Atlantic States Carpenters Benefit Funds as successors to Keystone Mountain Lakes Regional Council of Carpenters and the Trustees Thereof, ("Petitioners"), by their undersigned attorneys, as and for their Petition, allege and say:

1.     Petitioners move before this Court for an Order, pursuant to the Federal Arbitration Act, 9 U.S.C.A. §§ 9 and 13 ("FAA"), confirming the award of the Arbitrator in the matter of the arbitration between Petitioners and KBD Construction LLC ("Respondent"), made on October 26, 2023, and directing that judgment be entered accordingly.  This Petition is made on the following grounds.

2.      At all times relevant, Petitioner Eastern Atlantic States Carpenters Benefit Funds as successors to Keystone Mountain Lakes Regional Council of Carpenters and the Trustees Thereof was, and still is, a labor organization within the meaning of Section 2(5) of the Labor Management Relations Act, 29 U.S.C. § 152(5) ("LMRA").  Petitioner Eastern Atlantic States Carpenters Benefit Funds as successors to Keystone Mountain Lakes Regional Council of Carpenters and the Trustees Thereof were, and still are, trust funds within the meaning of Section 302(c)(5) of the LMRA, 29 U.S.C. 186(c)(5), and employee benefit plans within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. 1132(e) and (f). Petitioners maintain a principal place of business at Raritan Plaza II, Fieldcrest Avenue, Edison, New Jersey 08818.

3.      At all times relevant, Respondent was, and still is, a business entity duly organized and existing under the laws of the State of New Jersey, with a principal place of business located at 1183 Dohor Avenue, Elmwood Park, New Jersey 07407.

4.      The jurisdiction of this Court is based upon the National Labor Relations Act, 29 U.S.C. 141 et seq., the LMRA, and the FAA.  Venue is proper in this District pursuant to 29 U.S.C. 1332(e)(2), because Petitioners maintain their principal offices in New Jersey and the underlying arbitration took place in New Jersey.

5.      Respondent is a signatory to a Collective Bargaining Agreement ("CBA").  A copy of the CBA and applicable Short Form Agreement are attached hereto as Exhibits "A" and "B" respectively.

6.     Respondent is also bound by the Declaration of Trust of the Carpenters' Funds.  A copy of the pertinent portions of the applicable Trust Agreement is attached hereto as Exhibit "C".  Under the terms of the applicable CBA and Trust Agreement, Respondent is required to make contributions to the Funds.  In accordance with the CBA, J.J. Pierson, Esq., has been appointed as the Arbitrator to resolve claims of delinquent contributions owed to the Funds.

7.     On October 26, 2023, after finding that Respondent was duly notified of the hearing and considering all of the evidence presented in connection therewith, the Arbitrator issued an Opinion and Award in writing, a copy of which is attached hereto as Exhibit "D".

8.     Notwithstanding the Opinion and Award of the Arbitrator and notice of the same, Respondent has failed and refused in all aspects, and continues to fail and refuse in all aspects, to comply with the Opinion and Award.

**WHEREFORE**, Petitioners respectfully move this Court to proceed expeditiously and without a hearing under F.R.C.P. 78(b), and to enter an order confirming said arbitration award, directing that judgment be entered thereon and awarding such other relief as the Court may deem equitable and just including, but not limited to, court's filing fee in the amount of $405.00.

**KROLL HEINEMAN PTASIEWICZ &
PARSONS, LLC**
*Attorneys for Petitioners*

*S/ BRADLEY M. PARSONS*

By:     _____

BRADLEY M. PARSON

Dated: December 26, 2023

# EXHIBIT A

# AGREEMENT

*by and between*



## KEYSTONE + MOUNTAIN + LAKES REGIONAL COUNCIL OF CARPENTERS

and

## EASTERN MILLWRIGHT REGIONAL COUNCIL

of the UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA

## ASSOCIATED CONSTRUCTION CONTRACTORS OF NEW JERSEY

and their affiliates

## NORTHEAST MILLWRIGHT CONTRACTORS ASSOCIATION

## DRYWALL & INTERIOR SYSTEMS CONTRACTORS ASSOCIATION, INC. OF NEW JERSEY

## CONSTRUCTION CONTRACTORS LABOR EMPLOYERS

**EFFECTIVE**
*May 1, 2019 – April 30, 2022*

### TABLE OF CONTENTS

| Article | Article No. | Page No. |
|---|---|---|
| Accident or Sickness | XXXVIII | 30 |
| Agreement | | 2 |
| Agreement and Termination | XLVI | 48 |
| Authority of Employer's Association | II | 3 |
| Call Out Pay | XXXIX | 30 |
| Continuing Education & Training | XLV | 47 |
| Federal and State Law Conflicts | V | 4 |
| Foreman Carpenters | XXX | 25 |
| Fringe Benefit Funds | XXXII | 26 |
| Furnishing of Tools | XII | 11 |
| General Working Conditions | XXII | 19 |
| Grievances and Arbitration | XVIII | 16 |
| Individual Employee Rights | XXVII | 23 |
| Joint Committee | III | 3 |
| Jurisdictional Settlement Procedure | XI | 11 |
| Label | XXIX | 25 |
| Lay-Off | XXV | 21 |
| Layout Work | XXXV | 27 |
| Market Share Expansion Addendum | XXXI | 25 |
| Miscellaneous | XXXVI | 28 |
| More Favorable Conditions | XIII | 11 |
| No Other Verbal Agreements | XLIV | 47 |
| Non-Discrimination | VII | 5 |
| Payment of Wages and Fringes | XXIV | 21 |
| Picket Line | XXXVII | 29 |
| Portability | XVI | 14 |
| Recognition | I | 2 |
| Recognition of Floor Laying and Finishing | XLIII | 42 |
| Recognition of Heavy and Highway Work Covered | XLI | 40 |
| Recognition of Interior Systems Work Covered | XLII | 41 |
| Recognition of Millwright Work Covered | XL | 30 |
| Referral Procedure | VI | 5 |
| Safety Regulations | XXXIV | 27 |
| Shift Work | XXI | 18 |
| Shop Steward | XIV | 12 |
| Subcontractor Clause | XIX | 17 |
| Territorial Jurisdiction | VIII | 5 |
| Trade Autonomy | IX | 6 |
| Training, Safety and Advancement Fund | XXXIII | 26 |
| Unemployment and Temporary Disability Insurance Coverage | XX | 17 |
| Union Security | IV | 4 |
| Union's Right to Strike Delinquent Employers | XXVI | 22 |
| Visitation by Business Representative | XVII | 16 |
| Wages and Fringe Benefits | XXVIII | 23 |
| Work Jurisdiction | X | 6 |
| Work Rules | XV | 12 |
| Working Hours and Holidays | XXIII | 19 |

1

## AGREEMENT:

WHEREAS, the Associated Construction Contractors of New Jersey (ACCNJ) and its affiliated associations, expressly the Building Contractors Association of South Jersey, Northeast Millwright Contractors Association (NEMCA), Drywall & Interior Systems Contractors of New Jersey (DISCA) and the Construction Contractors Labor Employers (CCLE), is acting as the authorized bargaining agent for its employer-members who have assigned their bargaining rights to their respective Association, (hereinafter referred to as the "Association"), and any independent contractor signatory hereto, in the matter of wages, hours of work, and all other working conditions; and

WHEREAS, the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC) and the Eastern Millwright Regional Council of the United Brotherhood of Carpenters and Joiners of America (EMRC) (hereinafter referred to as the "Union"), are the authorized bargaining agent for all classes of employees performing work within the work jurisdiction of the United Brotherhood within the territory covered by this Agreement; and

WHEREAS, the Association and the Union have arrived at an Agreement on the issues to be incorporated within this Agreement;

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, BE IT AGREED AS FOLLOWS:

## ARTICLE I
## RECOGNITION:

1.      The Association recognizes the Union as the sole collective bargaining agent for all Journeymen Carpenters, Millwrights and Lathers and all of their apprentices, trainees and foremen, hereinafter referred to as employees, who perform work within the trade-line jurisdiction of the United Brotherhood of Carpenters and Joiners of America in the matters of wages, hours of work, and all other working conditions excluding, however, all supervisors as defined by the Labor-Management Relations Act of 1947, as amended.

2.      Each Employer bound hereto also agrees to comply with the wage rates, fringes, and working conditions in effect in the territories of all carpenter and millwright regions within the territories of the Union, affiliated with the United Brotherhood of Carpenters & Joiners of America.

3.      All contractor/union agreements shall be in accordance with all terms and conditions of the collective bargaining agreement currently in place in any local jurisdiction and for full term of said agreement.

4.      The Contractor acknowledges that the Union has demonstrated that the Union has majority support and represents a majority of the Contractor's employees in an appropriate unit for the purpose of collective bargaining. Accordingly, the Union demands, and the Contractor recognizes the Union as the exclusive bargaining agent under Section 9 of the NLRA for all of its employees within the contractual bargaining unit.

2

## ARTICLE II
## AUTHORITY OF EMPLOYER'S ASSOCIATION:

1.     The Association is acting herein as bargaining agent for its present and future employer-members of the Association and all affiliated local Associations in the State. The Association represents that it has the authority to execute this agreement on behalf of its members, who have assigned their bargaining rights to the Association, through the Associations' designated officers. Periodically, the Association shall provide the Union an up-to-date written list of all its employer-members, including affiliated Associations, who have assigned their bargaining rights to the Association, together with any deletions or additions in the roll of members. The Association represents that it will obtain like authority to bind future members to this Agreement.

2.     In the event any employer-member of the Association, who has assigned their bargaining rights to the Association, resigns from membership in the Association during the existence of this collective bargaining agreement, it shall nevertheless be bound by all the provisions herein for the existence of this agreement.

3.     The Union recognizes the Association as the bargaining representative of all affiliated Associations and general members of the Association, that have assigned their bargaining rights to the Association, that perform work within the trade-line jurisdiction of the United Brotherhood. This agreement shall be binding upon and enforceable against all such members, including their successors, assigns, and wholly or partly owned subsidiaries.

4.     The Association represents that it is duly authorized by its members and affiliated local Associations, who have assigned their bargaining rights to the Association, to enter into this collective bargaining agreement, that in so doing it is authorized to bind each of such members to the terms and conditions of this Agreement, and represents further, that it will require, as a condition of membership in said Association, that all of its participating members shall continue to be bound by such terms or, shall upon admission to the said Association, after the date of execution of this Agreement, agree to be bound from that date forward by all of the terms and conditions of this Agreement.

## ARTICLE III
## JOINT COMMITTEE:

A joint labor/management committee "Joint Committee", consisting of two representatives appointed by the Associated Construction Contractors of New Jersey (ACCNJ) and its affiliated Associations and two representatives appointed by the Drywall & Interior Systems Contractors of New Jersey (DISCA), along with four representatives appointed by the Executive Secretary/ Treasurer of the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC) shall be formed to address contract issues which do not involve millwright work and meet on a quarterly basis and, if necessary, at the call of the Co-Chairs of said committee. By unanimous agreement, the Joint Committee shall have the authority to implement contract changes within the term of this agreement. The Joint Committee shall address jurisdictional issues that arise during the term of this agreement. By unanimous agreement, the Joint Committee shall have the authority to negotiate terms and conditions of a residential agreement.

## ARTICLE IV
## UNION SECURITY:

1.     All employees who are present members of the Union shall maintain their membership in good standing in the Union in order to continue in employment. All new employees, on the eighth (8th) day following the beginning of their employment or the execution date of this Agreement or the effective date of this agreement, whichever is the later, shall become and remain members in good standing of the Union in order to continue in employment, all to be applied and enforced in accordance with the provisions of the National Labor Relations Act, as amended. Nothing in this Agreement shall be construed as infringing upon the Union's right as expressed in Section 8(b) of the National Labor Relations Act as amended to prescribe its own rules with respect to the acquisition and retention of membership therein.

2.     Eight (8) days under this Article shall mean employment within the bargaining unit for a period of eight (8) days, either continuously with one employer or accumulative with any employers' signatory to this Agreement.

3.     In the event that the present provisions of the National Labor Relations Act are amended so as to permit a greater degree of Union security than that now permitted by Section 8(a) (3) thereof, said amendments shall immediately, upon their effective date, be considered to be an integral part of this Agreement as if fully set forth herein.

4.     In the event an employee fails to tender the initiation fee or fails to maintain membership in good standing, the Union shall notify the Employer, in writing, and such notice shall constitute a request to the Employer to discharge said employee within forty-eight (48) hours (Saturdays, Sundays and Holidays excluded) for failure to maintain continuous good standing in the Union, as set forth herein. The Employer then shall discharge such employee at the end of such period. In the event the Union does not accept into membership any employee tendering the initiation fee and regular monthly dues, the foregoing shall not be applicable; provided, however, that the Union may, at any time thereafter, decide to take such employee into membership, and if so, the employee then shall be required to tender the full and uniform initiation fee in effect in the Union not later than thirty (30) days following notification by the Union, and shall be required thereafter to maintain membership in accordance with the provisions of the foregoing. In the event that such employee fails to comply with these provisions, the Union shall notify the Employer, in writing, and the Employer shall discharge such employee within forty-eight (48) hours.

5.     In consideration of the foregoing, the Union agrees to furnish competent employees to the employer upon his request.

## ARTICLE V
## FEDERAL AND STATE LAW CONFLICTS:

Where any provision of this collective bargaining agreement or the application of such provisions to any person, thing, or circumstances shall be in conflict with any federal or state laws or regulations or where such provision or the applications thereof shall be held invalid or unenforceable by a Court of Law or Equity or by any administrative governmental agency having jurisdiction over the subject matter, such decision as to the invalid provision shall not affect the balance of this Agreement which shall remain in full force and effect. The parties hereto agree that

4

they will meet within ten (10) days after such provisions have been declared invalid and negotiate a substitute provision to be incorporated herein.

## ARTICLE VI
## REFERRAL PROCEDURE:

Not excluding the provisions provided for in Article XVI-Portability, the Employer agrees to give the territorial Carpenters Local Union hiring hall first opportunity to furnish competent and qualified journeymen and apprentices upon the Employer's request and the Carpenters Local Union agrees to supply such craftworkers. When the Carpenters Local Union does not furnish qualified employees within 48 hours (Saturdays, Sundays and Holidays excluded), the contractor shall be free to obtain employees from any Keystone + Mountain + Lakes Regional Council of Carpenter Local Union. All referrals for millwrights shall be made through Millwright Local 715 in accordance with the referral procedures described in Article XL.

## ARTICLE VII
## NON-DISCRIMINATION:

1.      The Union and the Employer agree to abide by all Executive Orders and subsequent amendments thereto, regarding the Civil Rights Act of 1964, pertaining to non-discrimination in employment, in every respect, subject however to the rights of the parties to contest the illegality of any such Orders or Amendments in a court of law.

2.      Whenever an imposed minority hiring plan or a voluntary hiring plan shall provide for the employment of trainees, they shall be employed subject to the terms and conditions of this Agreement to the extent that such minority hiring plan shall permit.

3.      The Association agrees to cooperate with the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC) and the Eastern Millwright Regional Council (EMRC) in the development and implementation of uniform procedures for meeting requirements of minority hiring plans on a statewide or regional basis so as to eliminate the multiplicity of conflicting plans now being developed on a job by job basis. Nothing herein shall preclude either party from participating in a voluntary plan, nor shall anything herein require either party to enter into a voluntary plan.

## ARTICLE VIII
## TERRITORIAL JURISDICTION:

This Agreement shall cover the entire Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC) in New Jersey and its member Local Unions comprised of the following Regions:

| | |
|---|---|
| Local 251: | Floorlayers - Council wide |
| Local 253: | Commercial – Bergen, Essex, Hudson, Passaic Counties |
| Local 254: | Commercial – Hunterdon, Mercer, Middlesex, Morris, Somerset, Sussex, Union, Warren Counties and Parts of Essex County (Short Hills and Millburn) |
| Local 255: | Commercial – Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Monmouth, Ocean, Salem Counties |

5

## ARTICLE IX
## TRADE AUTONOMY:

1.      The trade autonomy of the United Brotherhood of Carpenters and Joiners of America consists of the milling, fashioning, joining, assembling, erecting, fastening or dismantling of all material of wood, plastic, metal, fiber, cork and composition and all other substitute materials. The handling, erecting, installing and dismantling of machinery and equipment and the manufacturing of all materials where the skill, knowledge and training of the employees are required, either through the operation of machine or hand tools, either at the job site or in production shops, mills and factories.

2.      Our claim of jurisdiction, therefore, extends over the following divisions and sub-divisions of the trade: Carpenters and Joiners; Lathers; Millwrights; Pile Drivers, Bridge, Dock and Wharf Carpenters; Divers, Underpinners, Timbermen and Core Drillers; Shipwrights, Boat Builders, Ship Carpenters, Joiners and Caulkers; Cabinet Makers, Bench Hands, Stair Builders and Mill-men; Wood and Resilient Floor Layers and Finishers; Carpet Layers; Display Workers; Shinglers, Siders and Insulators; Acoustic and Drywall Applicators and Finishers; Shorers and House Movers; Loggers, Lumber and Sawmill Workers; Furniture Workers, Reed and Ratan Workers; Shingle Weavers; Casket and Coffin Makers; Box Makers, Railroad Carpenters and Car Builders and all those engaged in the operating of wood working or other machinery required in the fashioning, milling or manufacturing of products used in the trade, or engaged as helpers or tenders to any of the above divisions or sub-divisions.

3.      Burning, welding, rigging and the use of any instruments or tools for layout work, incidental to the trade.

4.      When the term "Carpenter and Joiner" is used, it shall mean all sub-divisions of the trade.

## ARTICLE X
## WORK JURISDICTION:

A.      The Association recognizes that the Union claims the following work jurisdiction:

The terms "carpenters" and "joiners" shall be synonymous.

1.      The prefabrication, fabrication and construction of forms for footings or foundations of houses, buildings structures of all descriptions, whether made of wood, plastic or any other material, the erecting of structural parts of a house, building or structure made of wood, precast concrete or any substitute such as plastics, or composition materials, putting together roofs, partitions, fabricating or erecting forms for decking or other structural parts of houses, buildings, or any structure and stripping and dismantling of all forms. Installation of steel bar joist, metal decking and pour stops on all floor systems including composite.  The fabrication, erecting and dismantling of all falsework. Where power is used for the setting or dismantling of forms or any other material erected by Carpenters, the Carpenter will do all handling, tagging and signaling. The fabrication and/or setting of all templates including anchor bolts necessary for structural members or machinery and the placing and/or leveling of these bolts is included. The installation and removal of all safety or weather protection, whether temporary or permanent, also the erection and dismantling of all shanties, including tarps or tents of all materials, and building of platforms,

6

runways, catwalks and elevator shafts, whether temporary or permanent.

2.     The handling, carrying, loading, unloading and conveying of all materials erected or installed by employees represented by the UBC.

3.     The shoring of banks, slopes, holes, including the driving of sheeting in areas where Carpenters perform work.

4.     All framing in connection with the setting of metal columns. The setting of all forms, centers, imbedded wood and bulkheads of any type of material including expanding metal; the fabrication and setting of screeds and stakes for concrete and mastic floors where the screed is notched or fitted or moulded or made up of more than one member and the setting of all screed and forms pertaining to slope protection. Setting, assembly and maintenance of screed machines and lining and leveling of the track. The making and setting of all forms used in concrete work. The handling, installing and stripping of adjustable bar or span-all joists.

5.     The installation of all louvres and all moulding, column-covers and trim made of wood, metal, plastic or composition, installing of run-strips for plumbers or other trade or cutting for pipes through floors, joists or partitions composed entirely or in part of wood or other material erected by Carpenters. The installation of all framework, partitions and trim, materials for toilets and bathrooms made of wood, metal or plastic or composition materials; bathroom partitions, accessories and their backing made of wood, plastic, metal or any other material; fastening on all wooden, plastic or composition cleats to iron work or any other material; the erecting and installation of stran steel or similar material; cutting and hanging all lumber or other material between girders and joists for fire proofing or concrete centers; setting and hanging of all sash, doors, inside and outside blinds, windows and other frames; erection or application of all shingles, standing seam roofs and all other types of architectural metal building applications including roofs, vertical seam steel siding, aluminum siding, siding wallboard, or sheets composed of wood pulp, plastic, plaster, transite or composition materials or any combination of any of the above with any other material including combined or faced with metal regardless of the manner attached; the erection and assembly of interior and exterior signs or displays of all types; set up and dismantle of all displays, signs, banners, kiosks and tents whether temporary or permanent; unloading, handling and erection of all wood, metal, plastic and composition partitions; cutting and applying of all furring; making and fastening of wood brackets for metal ceilings and side walls; erecting of all furring regardless of composition, and putting on all grounds for plaster or cement finish.

6.     The building, erection and dismantling of all staging and scaffolding regardless of height where carpenters shall perform work thereon, including all types of protection and work platforms utilized for any part of the industry, whether wooden, tubular, mobile, stationary or otherwise, including "Morgan" type scaffolding and other self-rising scaffolding; the maintenance, repair and jacking of all mechanical scaffolding such as "Morgan" scaffolding including installation, maintenance and dismantling of bridge brackets and catch plank; the building and constructing of all derricks; the erection and dismantling of elevators and towers, such as concrete conveyors and temporary material elevators, scaffolding or other structures to be used as scaffolding inside or outside buildings, the making of mortar boards, boxes and trestles; putting in needle uprights; all shoring of buildings, razing and moving buildings whether commercial or residential, jacking and lifting. Installation of all work related to boardwalks and all related components.

7.    Fitting, installation and fastening of stops, beads and molding in doors and windows; framing of all false work, derricks and hoists, travelers and all lumber or material used in the building and construction industry; putting on of all hardware; putting up interior and exterior trim or finish of wood or substitute material.   The hanging, setting and installation of wood, metal or plastic doors, including but not limited to fire, formica, overhead and security doors, sash, jambs, bucks, including freestanding bucks, casings, moldings, chair rails, mantels base or mop boards wainscoting furniture, china closets, kitchen cabinets, serving counters, booths, wardrobes, non-electrical bells, mail slots, interviewers, knockers, louvers, kickplates and installation of bowling alleys, and installation of displays; setting of vanities of all types with or without fixtures, all lockers, regardless of their composition.

8.    The manufacturing and erecting of cooling towers, refrigeration buildings and rooms, sauna baths and tanks. The erection and installation of all hospital and laboratory Clean Rooms and associated equipment & accessories and all other work associated with Infectious Control Risk Assessment (ICRA). The installation of wood, plastic or metal awnings, door shelters, marquees, jalousies and plastic roofs. The laying and finishing of all floors including wood, knitter house floor tile or liquid substances for floor tile, cork, asphalt, linoleum, vinyl, rubber, liquid, Astroturf type covering and other synthetic turf products or any other type of resilient floor covering, the preparation of various floors for receiving any of said types of flooring or covering. Installation of elevated and floating floors. The installation of rugs, carpets, draperies, tracks, cubicles and curtains. The application of acoustic tile whether glued or nailed; acoustical suspended ceilings in their entirety; installation of Armstrong and/or other brands of low voltage ceiling grid systems; and all insulation of all types including bats or blankets, whether rigid or otherwise, whether nailed, glued or blown. The installation of all premanufactured walls, assemblies and Head Panels associated with all facilities.

9.    Building, handling, installing, unloading and erecting stairs, store, office, bank and other fixtures, furniture, wrapped, bundled, crated or not, refrigeration cases, whether for display or otherwise and walk-in boxes, shelving, racks whether of wood or other material; making and fitting of screens; putting on weather strips and caulking.   The installation of laboratory equipment including cabinets and overhead air handling units, fume hoods, alberene stone tops, sills and work benches, including Alucibond panels and terra cotta rain screen and any component of a total envelope system whether wood or metal, medicine cabinets with or without mirrors, or electrical fixtures, bookcases, including Nesbitt type bookcases, fume cabinets, and cabinets either separately or used in conjunction with heating and / or air conditioning units, blackboards, bulletin boards, billboards, meter boards and boards of all types including all layout, drilling and fastening related to the installation of these products. The receiving, unloading, handling, installation, erection and dismantling for re-use of all seating facilities.

10.    The handling and installation of lumber, fixtures, trim and other material including exterior and interior metal studs, drywall and gypsum wallboard of all types, regardless of finish. Drywall taping and finishing.   The erection of porcelain enameled panels, glass-weld type panels, wood, Masonite, corespan and transite type and metal siding. The assembling and setting of all seats in theaters, halls, churches, schools, banks, stadiums and open-air theaters and other buildings; installing wood, metal, plastic, corner beads, gypsum, tectum or similar planking and any material which receives poured gypsum; erecting mortar and brick hoists and concrete distributors used in erecting buildings or fireproofing floors or for pouring concrete buildings, building and repairing coal pockets, breakers, washers, tripples; setting of forms for sidewalks,

8

sidewalk lights, curbs within property lines and on highway structures, utility vaults within the property lines, gutters; erection and installation of hampers, trash, garbage, laundry or mail chutes regardless of composition of material and all welding and burning incidental to carpentry. Setting and welding of armor joints, expansion joints, or any other imbedded item. The installation of cork, Styrofoam, urethane, foam-glass or any other form of insulation material used in construction of walk-in boxes, refrigerators, freezers, coolers, foundations and all interior and exterior sidewalls, roofs and ceilings, etc. and the installation of doors thereto.

11.    All fitting, mortising or boring of holes for hardware on doors must be done on the job site, except pre-finished doors, metal doors, specially finished doors or when otherwise required by Architects specifications.

12.    The operation of winches and jacks whether operated manually or operated mechanically by portable operating devices, used to handle material to be installed or erected by carpenters and all tagging and signaling incidental to the trade.

13.    The handling and installation of all prefabricated, precut and modular structures, pre-engineered buildings, regardless of composition. The erection, disassembling and repair of metal, wood, or plastic forms for modular units. The handling and installation of all wood, vinyl or composite fencing, pre-manufactured playground equipment, all types of athletic equipment regardless of composition.

14.    The maintenance and operation of small generators, welding equipment, gas operated saws, electric saws, skill saws and other portable equipment used by carpenters in the performance of their work. Maintain shall mean starting, stopping, oiling, greasing, gassing, handling and sharpening, if done on the job site and when requested by the employer, repairs on the jobsite.

15.    All work in relation to the installation of Photovoltaic Energy Systems (Solar Panels) to include the following: foundations, anchor-bolts, supports, brackets, pans, racks, positioning motors, counterweights and supporting structures of any kind regardless of material or design.

All rigging, setting prefabrication, fastening, welding, bolting in relation to these systems, whether built on land, flat roofs, pitched roofs or any other application.

When systems are mounted on motorized frames designed to be directed towards sunlight, the motorized systems will be the work of the millwright.

16.    Any change in technology or materials that replaces an application that falls under carpenter or millwright jurisdiction shall be deemed the work of the carpenter or millwright.

17.    Slot Machines-Transport & movement, Bolting & unbolting, drilling of holes, mounting of bill changers, Repair & installation of plastic laminate, Installation of top sections & additions, Installation & removal of all slot machines including slant tops and novelty machines. Slot Machine Bases-Transportation & movement, fastening together, drilling of holes, Cutting, altering, repair & modification, Installation of filler pieces, Repair & installation of laminate and corner guards, Installation & removal of all slot machine bases.   Gaming Tables and Furniture-

9

Transportation & movement, Assembly & disassembly, Cutting, alteration, repair & modification, Installation of all gaming tables and furniture, Repair and installation of laminates, upholstery and fabrics, Installation & removal of all gaming tables and furniture, including but not limited to Black Jack, Roulette, Pia Gow, Poker, Baccarat, Mini Baccarat, Big Six Wheel Tables, Caribbean Stud, etc., including all stools & chairs, etc. that accompany gaming tables. All pit stands and related furniture accessories. Figurines, Statues, Ornaments, Artifacts, Wall Hangings and Ornamentations-Transportation & movement, Assembly & disassembly, Installation & removal, Cutting, alterations, repair & modification, The building and fabrication of all landscaping items, e.g. rock scapes, trees & etc.

18.     Unloading and Installation of all products that have a UL or other outside testing agency approval.

B. Lathing

1.     Lathing shall be assigned to journeymen and apprentices represented by this Regional Council on the following work: erecting, constructing, installing and completing of all light iron construction, furring; making and erecting of brackets, clips and hangers; wood, wire and metal lath; plaster board or other material which takes the place of same to which plastic or acoustical material is adhered; corner beads, all floor construction; arches erected for the purpose of holding plaster, cement, concrete or any other plastic or acoustical material.

2.     All carrying bars, purlins and furring, regardless of size; light iron and metal furring of all descriptions such as rods, channels, flat iron, nailock, screwlock, pomeroy and other ceiling bars or systems for the receipt of metal lath, rock lath, gypsum board, or any other materials and all light iron and metal studs such as stran studs, penn metal, soule, truscon and other trade names of metal studs and all other types of light iron and metal studs, no matter what the manufacturer including Unistrut, when such studs are to receive a dry wall finish, such as gypsum board, wall board, wooden paneling, etc., or when such studs are to receive metal lath, rock lath or other material for the application of plaster or other sprayed on wet material; and all other light iron furring erected to receive lath, plastic or acoustical materials. Installation of all Unistrut.

3.     The nailing, tying and fastening of all wire and metallic lath such as wirecloth, wire mesh, expanded metal lath, hyrib lath and all rib and flat expanded metal lath and wire of all descriptions as well as the placing of all hangers and all inserts used for the purpose of supporting suspended ceiling of any of the above types of light iron or metal furring which receive lath, plastic or acoustical materials; the placing of all types of floor lath, such as hyrib lath, paper-back steeltex floor lath, Penn metal rib, and all other appurtenances connected therewith.

4.     The erection of all metal plastering accessories such as metal corner beads, door and window casing beads, metal picture mould, metal chair rail, metal base and base screed and any and all other metal plastering accessories which are covered and/or serve as a ground guard, stop, or screed for plastic material.

5.     Such other work as falls within this article as such other work may now exist or may come into being as a result of the development of new methods and new materials, including, but not limited to the installation and erection of the drivit and other synthetic stuccos and similar systems.

10

6.      Installation of formwork for reinforced concrete construction where such agreements prevail.

7.      The loading, unloading, carrying, placing and handling of all materials falling within the trade jurisdiction of this Council from the point of delivery on the jobsite to the point where work is to be performed with said materials.

## ARTICLE XI
## JURISDICTIONAL SETTLEMENT PROCEDURE:

1.      It is agreed between the Union and the Association that this agreement is applicable to construction work that is primarily within the recognized and traditional jurisdiction of the Union and shall be performed in accordance with the terms of this agreement. It is further agreed that should any employer be required to perform construction work that is within the recognized and traditional jurisdiction of another Union with which the employer has a similar agreement for the performance of that work, then work assignments shall be made in accordance with Agreements of Record or prevailing area practice. If the Union is still aggrieved over any assignment, the matter shall be referred to the respective General Presidents of both contesting Unions in an effort to seek a resolution. If the matter fails of satisfactory resolution in this manner, the parties may agree to select an impartial third party or pursue the matter through the procedures of the National Labor Relations Board. Pending an orderly resolution of the matter, there shall be no interruption of work by a work stoppage, strike or refusal to refer employees to the project by the Union.

2.      It shall not be a violation of this Agreement if an Employer is signatory to a Collective Bargaining Agreement prior to May 1, 2007 with another trade union claiming drywall taping and finishing jurisdiction and as such uses a workforce from that Union for the performance of that work.

## ARTICLE XII
## FURNISHING OF TOOLS:

The Employer shall furnish all drills, hacksaw blades, all wrenches over one (1) inch, files, taps, reamers or any other special tool that is not normally carried in an employee's kit of tools including all power activated tools whether electric, chemical propellant air or gas powered. Any stock room crib that is on the premises of a job where the distribution of tools or materials, etc., are being distributed to employees, shall be operated by an employee depending on the type of work being performed.

## ARTICLE XIII
## MORE FAVORABLE CONDITIONS:

The Union hereby agrees that if it affords any conditions of a more favorable nature to any other employer with whom it has a collective bargaining agreement who performs the same or similar work, that said more favorable condition shall automatically be incorporated in this Agreement and be afforded all members of the Association covered hereunder, upon request.

11

## ARTICLE XIV
## SHOP STEWARD:

1.      The Executive Secretary-Treasurer or his designee having jurisdiction over the job, will select a certified Shop Steward. A Shop Steward shall always be employed whenever covered work is being performed on any job, except at the end of the job when punch list work is being performed by one employee which does not exceed three (3) days. The steward's employment may be terminated by the Employer after review of complaint against him between the employer and the Business Representative. In the event of a disagreement between the Business Representative and the employer, the complaint shall be referred to the Executive Secretary-Treasurer or his designee for whatever internal actions considered appropriate. The employer may request a Shop Steward be appointed from the employer's regular complement of employees, with the consent of the Union, providing he has the appropriate training certifications from the Keystone + Mountain + Lakes Regional Council of Carpenters'(KMLRC) shop steward certification program and/or the Eastern Millwright Regional Council's shop steward certification program, and who otherwise meets all of the Union's requirements for appointment as a shop steward. Consent shall not unreasonably be withheld, particularly on smaller projects.   In the event the Union appoints a shop steward from an employer's regular compliment of employees and that steward fails to fulfill his duties, he will be immediately removed from the position and replaced by the Union.

2.      The Shop Steward must 1) report to the Local Union prior to the start of the job to pick up the appropriate paperwork and instructions; 2) fill out the appropriate paperwork; and 3) deliver the appropriate completed reports to the Local Union hall after the end of the workday on Friday of each week. The Shop Steward shall only take the necessary time to perform his duties to the best interests and safety of the covered employees. There shall be no non-working Shop Stewards and the Shop Steward shall not be permitted to leave the job for the performance of his duties unless by the consent of the Employer.

3.      The Shop Steward shall have no authority to call any strike or stoppage of work or to make any Agreement which changes, modifies or alters any of the terms and conditions set forth in this Agreement.   The Shop Steward shall be given two hours notification before an employee is laid off. The employee shall be given one-hour notice of layoff. In the spirit of cooperation and as a courtesy, the employer will make every reasonable effort to notify the Business Agent twenty-four hours in advance to laying off six or more employees at one time.

4.      The Shop Steward shall not be discriminated against for attending to his or her duties.

## ARTICLE XV
## WORK RULES:

Section A:

1.      The welding torch, burning equipment and chain falls are tools of the trade having jurisdiction over the work being performed. Employees using these tools shall perform any of the work of the trade and shall work under the supervision of the craft foremen. The Employer shall provide the welding and burning protective equipment for this work. When a Millwright is

12

welding, burning or grinding and the owner mandates a Fire Watch, a Millwright shall be designated as said Fire Watch.

2.      There shall be no limit on production by employees nor restrictions on the full use of tools or equipment. There shall be no restriction, other than may be required by safety regulations, on the number of employees assigned to any crew or to any service.

3.      All manually-operated or power operated equipment required for the performance of millwright work shall be used by carpenters and millwrights.

4.      Slowdowns, standby crews and featherbedding practices will not be tolerated.

5.      A steward shall be a qualified employee performing work of his craft and shall exercise no supervisory functions. There shall be no non-working stewards. Maximum time allocated to union business shall not be excessive.

6.      There shall be no illegal strikes, work stoppages or lockouts.

7.      Employees shall observe the employers' rules and regulations not inconsistent with this agreement which shall be posted at the project.

8.      A copy of said rules and regulations shall be furnished to the Union at least ten (10) days prior to posting.

9.      The selection of craft foremen and general foremen shall be entirely the responsibility of the employer, it being understood that after selection of the first foreman, the second and subsequent foremen shall be selected by the employer from among qualified employees in the Council. Foremen and general foremen shall take orders from individuals designated by the employer.

10.      Employees shall leave their designated shanty or tool room at the starting time and shall remain at their place of work until the quitting time. In high rise buildings, this shall apply where an elevator is available.

11.      There shall be no limitations or restriction on the employers' choice of materials, design, methods or techniques of construction.

12.      The Employer agrees that Carpenters will maintain forms at all times when pours are being made, except ordinary footings and grade slabs one board in height (12").

13.      It shall be the responsibility of the employer to notify the Union via telephone, facsimile or email twenty-four (24) hours before job start to give the Union the ability to select a certified shop steward/journeyman.

14.      It shall be the responsibility of Union members to notify Centralized Dispatch (MIX 20/20) before the start of a job.

13

Section B – Portability Requirements:

1.      To obtain portability, all Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC) members are required to report all changes of location or there will be revocation of portability.

2.      All new jobs are to be reported by contractors to the Centralized Dispatch (MIX 20/20) and be assigned a job number for each project. Failure to do so will result in denial of portability for that job.

3.      All employees shall be in good standing with the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC)

4.      All contractors must be current with their benefits contributions to the Northeast Carpenters Funds and any other Fund within the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC) in order to obtain portability.

5.      Denial of portability to Association Members for any of the above reasons shall result in the Association Member reverting to the portability provisions outlined in Section B under Article XVI, Portability.

6.      Solicitation of work by members will be permitted.

7.      Portability applies only to employees whose employment originated in the Keystone + Mountain + Lakes Regional Council of Carpenters' (KMLRC) geographic jurisdiction. Any employee whose employment originated outside of the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC) must be matched at a one-to-one ratio from the Council's referral system.

## ARTICLE XVI
## PORTABILITY:

Section A – Association Members:

Employers who are members in good standing of the management bargaining Associations signatory hereto who have accordingly assigned their bargaining rights for this Agreement to said management Association(s), shall be permitted portability of manpower as follows:

Up to twenty-five (25) bargaining unit employees; thereafter 1 union Council referral/1 key employee

There shall be 100% portability for Millwrights, Local 715.

All new jobs are to be reported to the Council's Local Union where the work is performed. Failure to report will result in a denial of portability for that job.

Key employees shall be defined as employees who 1) have worked a total of at least 1,000 hours

14

as a journeyperson carpenter under the terms of this Agreement during the prior three years for the employer; or 2) were on the Employer's active payroll working under the terms of this Agreement for at least 90 out of the last 180 calendar days; and 3) have demonstrated the ability to safely perform the functions of a journeyman carpenter.

It is agreed upon between the Union and the Association and the contractors that in order to keep harmony on job sites with large amounts of manpower, all parties shall work together to insure adequate representation of members from the local area. In the event a dispute arises due to lack of harmony, such dispute shall be referred to the joint committee to be resolved.

It is agreed that on large crews of 25 or more carpenters, employers will employ a minimum of 15% of carpenters with 25 years of service or more under the terms of collective bargaining agreements within the Council's geographic jurisdiction.

Section B – Non-Association Members:

Fifty (50%) percent of the first eight employees on the job shall be designated by the employer from the employer's contingent of key employees and fifty (50%) percent shall be referred by the Local Union. First employee shall be determined by the employer; second employee shall be referred by the Local Union and the remainder shall be in accordance with the aforementioned. One of each of the four subsequent employees shall be designated by the employer. The eighth and ninth employee shall be referred by the Local Union. The tenth employee shall be designated by the employer from the employer's contingent of key employees and the remainder shall be in accordance with the one to four ratio. Layoffs shall occur in reverse order.

All new jobs are to be reported to the Local Union where the work is performed. Failure to report will result in a denial of portability for that job.

All non-millwright employees shall be members in good standing of the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC). All millwright employees shall be members in good standing of the Eastern Millwright Regional Council (EMRC).

Key employees shall be defined as employees who 1) have worked a total of at least 1,000 hours as a journeyman carpenter under the terms of this Agreement during the prior three years for the employer; or 2) were on the Contractor's active payroll for at least 90 out of the last 180 calendar days; and 3) have demonstrated the ability to safely perform the functions of a journeyman carpenter.

Section C – Specialty Crafts:

　　　1. There shall be 100% portability for Tapers/Homebuilders.

　　　2. There shall be 100% portability for Floorlayers, Local 251.

　　　3.　　　The Joint Committee shall meet quarterly to discuss portability issues. By unanimous agreement, the Committee shall have the authority to implement contract changes within the term of this agreement which do not involve millwrights.

15

## ARTICLE XVII
## VISITATION BY BUSINESS REPRESENTATIVE:

The Business Representative shall be permitted to visit any job site of any Employer-member of the Association or any Employer who performs work under the terms of this Agreement. If security questions are involved, the Business Representative will abide by the rules and regulations.

## ARTICLE XVIII
## GRIEVANCES AND ARBITRATION:

1.    In the interest of uninterrupted progress on any and all work covered by this Agreement, the parties hereby agree that there shall be no lockout on the part of any employer and there shall be no strikes, work stoppages, picketing or slow-downs of any kind including any threats thereof engaged in by the Union.

2.    All questions or grievances involving the interpretation and application of this Agreement, other than trade jurisdictional disputes arising under Articles IX and X and the establishment of wage rates shall be handled under the following procedures:

Step I:        Between the company representatives and the business representative at the job site as soon as practical but in no event later than three (3) working days after the occurrence of the dispute. Failure to raise any dispute within three (3) working days of its notification, renders the dispute null and void.

Step II:        If not resolved pursuant to Step I, then between the Manager of the Region where the job is located, or a designee, and a company officer at the job site. This meeting should be arranged as soon as practical but in no event later than three (3) working days after the conclusion of step I.

Step III:        If not resolved pursuant to Step II, then between the Executive Secretary/Treasurer of the Regional Council, or a designee, and a company officer at the job site. This meeting should be arranged as soon as practical but in no event later than three (3) working days after the conclusion of Step II.

Step IV:        If the parties are unable to affect an amicable settlement or adjustment of any grievance or controversy, such grievance or controversy shall be submitted to binding arbitration under the Expedited Rules of the American Arbitration Association at the request of either party provided notice in writing of the intent to do so is given through the other party and the American Arbitration Association within thirty-five (35) working days after Step III has been completed. One of the following three Arbitrators (J.J. Pierson, Lou Verrone or Steven M. Wolf) shall be selected who shall hear the matter and his decision will be final and binding on the contract to the Union and all Employers.

3.    The Arbitrator shall render his decision in writing on the grievance and solely on the meaning and interpretation of the particular provision of the contract which gave rise to the dispute.

4.      The Arbitrator shall have no power to add to, subtract from, or modify this agreement.

5.      The parties affected shall be afforded a full opportunity to present any evidence, written or oral, which may be pertinent to the matter in dispute.

6.      Except by mutual agreement, all timeliness provisions must be complied with and failure to comply by either party will result in default by that party of its position.

7.      The Arbitrator shall render a decision in writing within ten (10) days after the close of an arbitration proceeding.

8.      No employee, except to the extent that the law permits, shall be allowed to compel the Union to proceed to arbitration in any matter which the Union does not consider justified.

9.      Each party shall share equally the expenses of the arbitrator.

10.     Any grievance filed against an Association contractor will be reported to the respective Association.

## ARTICLE XIX
## SUBCONTRACTOR CLAUSE:

1.      The Employer will not subcontract any work within the jurisdiction of the Union which is to be performed at the job site except to a contractor who holds an agreement with the United Brotherhood of Carpenters and Joiners of America or one of its subordinate bodies having jurisdiction at the job site, or who agrees in writing, prior to or at the time of the execution of his subcontract, to be bound by the terms of this Agreement.

2.      It shall not be a violation of this Agreement if an Employer subcontracts drywall taping and finishing work covered by this Agreement to an Employer who is signatory to a Collective Bargaining Agreement with another recognized building trades union, where such subcontracted work is within the recognized and traditional jurisdiction of another Union with which the Employer has maintained an agreement with the union since, on or before May 1, 2007.

3.      Upon request by the Business Agent, the employer will not withhold the names of all subcontractors who are to do any work covered by this agreement.

4.      The Employer represents that its members, officers, and supervisory personnel will not attempt to form or participate in the creation of or operation of new or double-breasted corporations for the purposes of avoiding the obligations of this Agreement.

## ARTICLE XX
## UNEMPLOYMENT AND TEMPORARY DISABILITY INSURANCE COVERAGE:

Each Employer agrees to immediately elect to become a covered Employer under the terms of the Unemployment Compensation Act -Temporary Disability Benefits Act, pursuant to the

17

Revised Statutes of the State of New Jersey, 43:21-1, et seq. The purpose of this clause is to provide unemployment compensation coverage and temporary disability benefit coverage for one or more employees of each Employer.   Failure to comply with this provision shall be considered a breach of this agreement as to the non-complying individual contractor and the Union reserves the right to cancel the agreement of that particular contractor for such breach.   The Employer will elect to become covered before the commencement of the job and the hiring of employees. He will provide the Union with his qualifying number as issued by the Division of Unemployment Security of the New Jersey Department of Labor and Industry.

## ARTICLE XXI
## SHIFT WORK:

1.     When so elected by the Employer, multiple shifts on a temporary basis of at least five (5) consecutive days duration may be worked. Any period of time less than five (5) consecutive work days may be considered shift work if mutually agreed to by the Union and the Employer.

2.     When a two-shift schedule (including a day shift) is established for carpenter employees, the first or day shift shall be established on an eight (8) hour basis. The second shift shall be established on an eight (8) hour basis and paid the base rate plus 10%.

3.     When a three-shift schedule is established, and mutually agreed to by the Employer and the Union, the following conditions shall prevail for carpenter employees. The day shift shall be established on an eight (8) hour basis, the second shift shall be established on a seven and one-half (7 ½) hour basis, and the third shift shall be established on a seven (7) hour basis. The first shift shall receive the base or regular hourly rate. The second shift shall receive the base hourly rate plus 10%. The third shift shall receive the base hourly rate plus 15%.

4.     When there is no day shift and a second shift or third shift is established and mutually agreed to by the Employer and the Union, the following conditions shall prevail for carpenter employees. The second shift shall be established on an eight (8) hour basis. The third shift shall be established on an eight (8) hour basis. The second shift shall receive the base hourly rate plus 10%.   The third shift shall receive the base hourly rate plus 15%.

5.     When an irregular shift must be established, the percentage premium shall be 15% above the base rate.

6.     The percentage premium, when added to the base rate, shall be termed the regular hourly rate.   Shift hours for the second and third shifts shall be such as to conform to the day shift and in no case shall an employee work on more than one shift within a 24-hour period.

7.     Separate safe and suitable rooms or lockers for the security of the employees' tools and clothing shall be provided for the employees of each shift.

8.     When the Department of Labor does not include the shift premium in the prevailing wage rate schedule, the shift work premium will be waived.

9.     All time worked before and after a regularly established shift shall be paid at the applicable overtime rate. When a portion of a regular established shift works into Saturday, Sunday or a Holiday, that time worked shall be paid at the established shift rate.

## ARTICLE XXII
## GENERAL WORKING CONDITIONS:

1.     The Employer shall provide a comfort station on the job to conform with the particular community's health laws, where the job or shop is located; provide sanitary drinking cups and water, which shall be iced between May 1 through October 1, as well as a suitable tool house with a lock. Suitable heating equipment shall be furnished for the shanties during the months of the year when heat is required. Tool sheds shall not be used as a storeroom for any purpose. It shall be kept clean and be of adequate size for the employees to eat their lunches. Where the employees' tools are stored on the job, they shall be stored in the premises designated by the Employer. The Employer shall be responsible for the loss of each employee's tools from fire or breaking and entering of any tool shed or shanty. No claim shall be made unless the aggregate loss of tools from fire or breaking and entering of any tool shed or shanty suffered by all employees on the job exceeds $25.00 overall. The liability of the Employer shall be limited to $500.00 per employee for carpenter tools and $1,250 per employee for millwright tools. The employer will issue a hard hat, safety glasses and all safety equipment. Any additional issue of safety equipment will be paid for by the employee, unless stolen or worn out.

2.     Where the Employer requires an employee of the Union, to use the employee's car on the Employer's business, the employer will provide public liability coverage for the use of such vehicle while the employee is using that vehicle for the Employer's purposes. Failure to so provide shall constitute an automatic breach and the Union may exercise its privilege of canceling the agreement on twenty-four (24) hours written notice.

## ARTICLE XXIII
## WORKING HOURS AND HOLIDAYS:

1.     Eight (8) hours shall constitute a day's work. Starting time may be flexible from 6:00 a.m. to 9:00 a.m. as mutually agreed to by the Business Agent and Employer. One half (½) hour for lunch, in the shanty, from 11:00 a.m. to 1:00 p.m. It is expressly understood, however, that while concrete is being poured employees covered hereunder who are attending forms may be given the thirty-minute lunch period anytime from 11:00 a.m. to 1:00 p.m., at the discretion of the Employer.

2.     Five (5) days shall constitute a week's work, Monday through Friday inclusive. Four (4) ten-hour days may be worked, when mutually agreed, Monday through Thursday at straight time pay. Friday shall be used as a makeup day at straight time for days lost due to inclement weather or for other mutually agreed reasons. If Friday is not a make-up day, all hours worked on Friday shall be paid at time and one-half providing there was work and the carpenter worked all four of the previous working days. If a carpenter does not work 40 hours during the work week prior to the Friday premium day and providing there was work for the carpenter, then all time up to 40 hours shall be paid at straight time. In all other instances, five eight-hour days shall be worked Monday through Friday at straight time pay. At no time shall the above be utilized to circumvent Holiday pay.

19

3.     Upon mutual agreement by the Employer and the Union, when during the course of a normal work week of eight-hour days from Monday through Friday, 36 hours or less are worked strictly due to weather conditions or an otherwise mutually agreed circumstance, the employing contractor has the option of working Saturday at straight time, not to exceed a forty-hour (40) work week. Hours over the forty-hour (40) work week worked on a Saturday will be paid at time and one half.     In the event other trades are working on Saturday for time and one half, Carpenters will also be paid at time and one half.

4.     Where a four ten-hour day schedule is established on a job, and 36 hours or less are worked due strictly to weather conditions or otherwise mutually agreed circumstances, Friday may be used as a make-up day for such hours lost at straight time up to 40 hours and the applicable overtime rates for all time over 40 hours.

5.     Any work performed outside the aforesaid hours or on Saturday or Sunday and the following Holidays, shall be considered overtime and paid accordingly: New Year's Day, Presidents Day, Memorial Day, Fourth of July, Labor Day, Veterans' Day, Thanksgiving Day, and Christmas Day. When all trades on a particular jobsite agree, the day after Thanksgiving may be substituted for Veterans' Day.   In the event a holiday falls on a Sunday, the following Monday shall be observed as the holiday.   The overtime rate Monday through Saturday shall be time and one-half; Sunday & Holidays shall be double time.

6.     In the event some other craft has a different holiday than those designated herein, the contractor shall endeavor to plan his work so as to minimize its impact to avoid a forced holiday.

7.     New hires shall report at 8:00 a.m., the established starting time, unless an earlier start is otherwise agreed upon, provided the contractor has called the union hall prior to 8:00 a.m. on the preceding day. Late arrivals will begin work and be paid from 9:00 a.m., 10:00 a.m. or whatever is appropriate.

8.     Any employer who requests an employee through the referral procedure to work on the same day the request is made by the Employer shall pay that employee from the mutually agreed starting time of that day.

9.     No work shall be performed by employees covered by this agreement on Labor Day except in the case of emergency and by permission of the Union. It is agreed that overtime is undesirable and not in the best interests of the industry or the employees. Therefore, except in unusual circumstances, overtime will not be worked. Where unusual circumstances demand overtime, such overtime will be kept at a minimum.   Prolonged use of overtime will be permitted only with the agreement of the Union and the Employer.   Whenever any employees are required to work more than two hour's overtime, a half hour eating period shall be provided with pay at the applicable rate.

## ARTICLE XXIV
## PAYMENT OF WAGES AND FRINGES:

1.    Employees shall receive their wages in cash or by check, when allowed as herein set forth, on the job in a closed envelope which shall be plainly marked as to each employee's name, the hourly rate, number of hours, deductions for vacation, dues and the various taxes, such as unemployment, social security and temporary disability.   The envelope shall show the gross amount of wages, the employer's name and address.   The Employees shall be paid prior to the end of the established weekly pay day, or an earlier day if the regular pay day falls on a recognized holiday when the banks are closed. Two (2) days back pay may be withheld by the Employer for each weekly pay.

2.    When payment by check is permitted, the Employer must comply with the requirements of state law, including N.J.S.A. 34:11-4.2 requiring that provisions be made to cash checks locally without reduction in amount.

3.    All members of signatory Associations throughout the State who have assigned their bargaining rights have submitted such a request and each employer member thereof has been approved by the Union. It is also understood that Payroll checks must be bonded and employees paid in cash when terminated, however, this rule does not apply to members of the signatory Associations.

4.    Fringe benefits must be paid weekly by check to the Shop Steward on the job and delivered to him with the necessary fringe benefit submission forms fully completed, unless permission to submit same by mail directly to the Fund Office is granted by the Trustees of the various funds. All members of the signatory Associations have been granted permission to submit payment and forms by mail to the various funds on a monthly basis. Management agrees to make every effort to utilize the electronic job reporting system to be developed.   In addition, the parties agree that electronic remittance of benefits is in the best interest of the parties.   To that end, management shall make every effort to utilize such a system when fully developed.

5.    The Business Agent or the Steward shall have the power to examine the pay of any employee.

6.    By mutual agreement between the carpenter and the employer, the employer may pay wages by direct deposit to the carpenters' bank account.

7.    The Union shall not restrict the use of electronic or mobile payroll systems.

8.    Any contractors working in New Jersey from other states must pay unemployment disability and state income tax to the proper New Jersey agencies. Contractors who were domiciled in a city or municipality that has a wage tax will not be permitted to apply such deduction working on projects within a city or municipality that has no applicable tax.

## ARTICLE XXV
## LAY-OFF:

1.    Employees who have been employed on a job four (4) or more days shall receive

21

one (1) hours' notice of discharge at which time they shall receive their pay.

2.      The Shop Steward shall be notified of all layoffs. When employees are required to wait for their wages after lay-off time, they shall be paid for every hour or half hour at time and one-half the hourly rate of pay. In the event a carpenter is dispatched that does not meet with the employer's required skills/certifications, that carpenter can be laid off after four hours on the first day only and a written notice shall be submitted to the Keystone + Mountain + Lakes Regional Council of Carpenters' (KMLRC) Union dispatch office outlining the employer's reasons for discharging the employee. If direct deposit is established and agreed to by the carpenter and the employer, upon layoff, the employer must send for direct deposit within 24 hours of layoff. For Association members, the employer must send for direct deposit within two business days or overnight mail for receipt of check within two business days.

## ARTICLE XXVI
## UNION'S RIGHT TO STRIKE DELINQUENT EMPLOYERS:

1.      A Local Union or Regional Council is granted an absolute right to strike the job of any delinquent Contractor and shall be under no compulsion to return any employees to employment with such Contractor until all delinquencies are completely paid up with legal or other costs of the Funds related to said delinquencies. The Union may terminate this Agreement as a result of the delinquencies with said delinquent contractor. These shall be exceptions to Article XVIII, Grievance and Arbitration Procedure, under this contract. Where such action is necessitated as a result of the delinquency of any Contractor in the payment of wages, or of any of the fringe benefit payments set forth elsewhere in this Agreement, such delinquent Contractor shall be required to pay the striking employees' wages for each day on strike, for a period not to exceed three (3) days, prior to their return to employment for such Contractor and shall not return until delinquency is satisfied or back payment arrangement agreed upon. The aforesaid payment shall be limited to wages and does not include payments to any fringe benefit fund.

2.      The Trustees of the respective Funds shall maintain appropriate actions in law or in equity, to collect the proper amount of contributions due, for an accounting of, or for any other appropriate relief.   Should legal action be required in order to effect collection of the money owed by the Contractor, or to effect an examination of his books and records, the Contractor shall be responsible, in addition to the money owed, for attorney's fees and disbursements incurred, court costs, plus interest at the rate of twelve percent (12%) per annum on all money, even though actual legal proceedings have not been begun.

3.      The Trustees of the respective Funds may require an Employer with a record of delinquencies or an Employer with no previous record of payments to the fringe benefit funds, to post a surety bond obtained from a carrier licensed to do business in the State of New Jersey or cash escrow with the Trustees prior to the commencement of any work by said Employer. Such bond shall be in the amount determined by the Trustees but not less than $5,000.00 and must guarantee the payment of Fringe Benefit payments required under this Agreement to all employees within the unit. A copy of such bond shall be furnished to the Union before the commencement of re-commencement of any work by such employees, or the escrow furnished.

The attorney's fees referred to above agreed upon as follows:

> WITH OR WITHOUT SUIT
> 27 ½% of the first $750.00
> 22 ½% over $750.00
> (Minimum $25.00 each fund)

All disbursements and expenses including arbitration fees are additional.

4.      It is further agreed that the Trustees of any Fringe Benefit Fund or an alleged delinquent employer may request arbitration of any alleged wage or fringe benefit fund delinquencies and arbitration must be heard within thirty (30) days after such request. The decision of the arbitrator shall be final and binding. The arbitration shall be heard in offices of the applicable Carpenter Funds or in the office of the counsel for the Funds and shall be in accordance with the rules of the New Jersey State Board of Mediation. In order to expedite such hearing, a Permanent Arbitrator is herewith designated and approved.   Said Permanent Arbitrator is J. J. Pierson.   The Permanent Arbitrator shall serve for a period of one year and shall be subsequently reappointed yearly thereafter upon affirmative vote of the Fund Trustees.

5.      All provisions with respect to any local fringe benefits funds that are in conflict with the foregoing shall prevail.

## ARTICLE XXVII
### INDIVIDUAL EMPLOYEE RIGHTS:

Each Employee in the bargaining unit individually reserves the right to cancel his services of labor on any job where non-union journeymen or apprentices are employed for a period exceeding the seven (7) days after which they may be required to become members of the Union, pursuant to a valid Union Security Contract.

## ARTICLE XXVIII
### WAGES AND FRINGE BENEFITS:

1.      The schedule of hourly wages and fringe benefit contributions Attached hereto as Appendix "A" shall be applicable during the term of this Agreement:

2.      FOREMAN: shall receive 15% over the journeyman's rate.

3.      GENERAL FOREMAN: shall receive 30% over the journeyman's rate.

4.      The Union has the option of applying any amount of wages to a vacation fund, check-off or dues. The Employer agrees to make such deductions and to direct payment of same to such offices as may hereafter be requested by the Union or Trustees of any such fund.

5.      It is agreed that the parties may, during the term of this agreement, exercise the option to convert any part of the wage package as payments to any fringe benefit program.

6.      There will be one uniform schedule of wages and fringe benefits, including dues check-off and other employee deductions, for the Union.

7.      Any Vacation monies which may be required to be paid to the Northeast Carpenters Vacation Fund are subject to the Trust Agreement.

8.      Carpenter apprentices shall be paid the following scale of wages:

| | |
|---|---|
| 1st Year | 40% of the journeyman's rate (0-2000 HRS) |
| 2nd Year | 55% of the journeyman's rate (2001-4000 HRS) |
| 3rd Year | 65% of the journeyman's rate (4001-6000 HRS) |
| 4th Year | 80% of the journeyman's rate (6001-8000 HRS) |
| 5th Year | 90% of the journeyman's rate (Applies to Apprentices initiated prior to May 1, 2019). After the fifth year and completion of Apprentice School, the full Journeyman's rate. |

The working hours of an apprentice shall be the same as those of journeymen except that the apprentice shall be guaranteed an eight (8) hour day on any day on which the job works for the first year of apprenticeship.

Effective May 1, 2019, carpenter apprentices must work 2000 hours, including school hours to advance to the next pay period to receive an increase in wages.

A carpenter apprentice working at rates based on the previous schedule and/or standard shall continue at those rates until his/her next anniversary date and/or at which time they meet the required hours necessary for an increase at which time he/she will be subject to the revised schedule.

It is agreed a Committee of Management and Labor will meet to develop an Apprentice schedule for all new carpenter Apprentices beginning January 1, 2020, as well as the creation of a new category entitled "Intermediate Journeyman."    The new classification may or may not apply to prevailing wage due to compliance issues with DOL. The Committee shall be empowered to finalize language pertaining to the wage/fringe benefit package for all new Apprentices and the Intermediate Journeyworker, the ratio of Apprentices to Intermediate Journeyworkers and Journeyworkers, as well as the requirements to reach Journeyworker status.

Association members shall have the ability to request apprentices at a 1 to 3 ratio.

In the event a contractor has 3 apprentices, one of those apprentices shall be either a 4th or 5th year. On larger crews, it is agreed that there will continue to be a contingent of 4th and 5th year apprentices mixed in with the ratio.

It is in the best interests of all parties that apprentices will not be solely dedicated to routine tasks such as loading/unloading material, fire caulking, or insulating for long periods of time that would infringe on their ability to obtain a well-rounded education while working on job sites. Union representatives and the contractors will work together to insure apprentices get proper well-rounded OJT (on the job training).

24

## ARTICLE XXIX
## LABEL:

All employees as individuals who work under the terms of this Agreement reserves the right to recognize the existence of or non-existence of the label of the United Brotherhood of Carpenters and Joiners of America on all materials, supplies and equipment which they install or erect.

## ARTICLE XXX
## FOREMAN CARPENTERS:

1.      Where there are 2 or more carpenter employees on the job, there shall be a foreman.

2.      The first crew of employees shall not exceed 20 employees exclusive of foremen.

3.      At such time as the 21st employee is employed, there shall be two foremen.

4.      A third foreman shall be hired at any time but no later than such time as the 36th employee shall be employed, at which time one of the three foremen shall be designated a general foreman, and thereafter additional foremen shall be hired with the employment of the 46th employee, 56th employee, etc., in multiples of ten.

5.      All foremen shall be "working foremen" at the discretion of the employer.

6.      On jobs exposed to inclement weather conditions, the duration of which jobs shall be of 10 or less working days exclusive of days lost by reason of inclement weather, and where there are less than 3 carpenters employed thereon, the foreman shall not receive pay for intervening inclement weather days or holidays. In the event that such jobs exceed 10 actual working days exclusive of holidays and days lost by reason of inclement weather, the foreman's usual pay requirements shall be retroactive to the commencement of the job.

7.      Except as provided for in paragraph six (6) above, all foremen, including the general foremen, shall be paid for the prevailing regular weekly basis for all normal working days between the initial date of employment and the termination date of employment, holidays and inclement weather days included, provided however that all foremen must report to work every day within the work week unless otherwise directed by the Employer. All overtime worked by foremen shall be compensated for at proper overtime rates.

## ARTICLE XXXI
## MARKET SHARE EXPANSION ADDENDUM

All members of the Associations who are signatory to this Agreement may utilize the Market Share Expansion Addendum for the scope of projects defined therein, subject to the exclusions so noted. All terms and conditions of this Collective Bargaining Agreement shall apply, except as modified by the Work Rules and Conditions defined in the Market Share Expansion Addendum.

## ARTICLE XXXII
## FRINGE BENEFIT FUNDS:

1.      The Employer acknowledges the fringe benefit funds (collectively known as the "Funds") that have been created by prior collective bargaining agreements and include the New Jersey Carpenters Funds, the New Jersey Carpenters Apprentice Training and Educational Fund, and the New Jersey Carpenters Contractors Trust.

2.      Each of the Funds is managed by an equal number of Employer and Union designated        Trustees in accordance with Agreement and Declarations of Trusts which govern the operation of the Funds. Any Employer party to this Agreement and not a member of the Association agrees that the Employer Trustees shall represent it on the Boards of Trustees of the Funds.

3.      The Funds shall be governed by the relevant state and federal laws in a manner consistent with the purpose of remaining tax-exempt employee benefit funds as approved by the Internal Revenue Service.

4.      Any Employer party to this Agreement explicitly and expressly agrees to all of the terms and conditions of the Agreements and Declarations of Trust governing the Funds and the Plans relating to each Fund as if these documents were set forth at length herein.

5.      Notwithstanding the termination of this Agreement at any time in the future and pending negotiations for a new agreement, each Employer agrees to continue to pay to the respective Funds, if any Employees represented by the Union are in their employ, contributions on behalf of such Employees in an amount not less than as stipulated herein.

6.      If any Employer defaults in the payment of his contributions to the Funds as stipulated herein or is in violation of the rules of collection set by the Trustees of the Funds, the Union may consider such defaults as a breach of this Agreement and may terminate this Agreement as to such defaulting Employer.

7.      The trustees of the Funds shall develop a collection policy that considers the slow pay provisions of the industry.   The trustees shall also develop a process for securing bonds by employers who have a history of late payment to the Funds.

## ARTICLE XXXIII
## TRAINING, SAFETY & ADVANCEMENT FUND:

1.      The parties to this Agreement agree to continued funding of a Training, Safety and Advancement Fund (TSA) pursuant to the requirement of the Labor-Management Relations Act, the Internal Revenue Code and all applicable laws and the agreement of parties for the purpose, in all lawful ways, of promoting the increase of commercial, institutional, public, industrial building and housing construction throughout the State of New Jersey and the adjoining areas within the territorial jurisdiction of the unions by providing building owners, architects, engineers, builders, contractors, private and public funding institutions and agencies, government agencies and any others, directly or indirectly with the building construction industry, information, data and other

26

information to communicate the advantages of sound, durable and economical construction that will provide a high degree of service, utilization and benefit to the public by the utilization of union affiliated contractors.   The purpose of the Fund shall be to foster and promote the continued utilization and expansion of union construction, particularly utilizing union members of the carpenters union, in prospective projects throughout the State of New Jersey.

2.      Effective May 1, 2019, and continuing thereafter, each Employer bound by this Agreement shall contribute $.43 per hour for each hour of non-millwright work covered by this Agreement to the UBCJA/Associations Health Safety Industry Funds, of which $.20 shall be allocated to the UBCJA National Safety and Health Programs and $.23 allocated to the ACCNJ and DISCA Industry Funds.   The Northeast Carpenters Fund office shall collect and distribute such funds.

3.      Although the above contribution is designated a "contribution" it is expressly understood and agreed that the said sum payable to said TSA is not intended to be and is not a contribution to employees and no employee of Employer has any proprietary interest in said funds.

4.      The parties hereto do hereby establish the Carpenters Contractor Trust (CCT) pursuant to an Agreement and Declaration of Trust. The CCT shall be a labor-management committee established under the Labor Management Cooperation Act of 1978. The terms and conditions of the Trust shall be mutually agreed to by the Union and the Associations. There shall be equal representation of both labor and management on said committee.

## ARTICLE XXXIV
## SAFETY REGULATIONS:

1.      All employers and employees shall be required to abide by all Federal, State and Local safety regulations, including but not limited to all OSHA regulations.   All covered employees shall abide by the employer's safety regulations. A joint Safety Committee of Labor and Management shall be established to develop the necessary programs to implement the above.

2.      Labor and Management agree to OSHA 30-Hour Training as necessary and the union will work toward having all carpenters trained by the end of this contract's duration.

3.      On buildings of seven (7) stories or higher, a safety-approved personnel elevator and a qualified elevator operator shall be provided by the employers.

4.      The Joint Safety Committee will develop a program for signatory contactors for the goal of maintaining a safe jobsite. At the request of the Employer members on said Committee, an individual from the Committee will be assigned to investigate Workers Compensation claims and to make recommendations if training is warranted to avoid future work place accidents.

## ARTICLE XXXV
## LAYOUT WORK:

1.      The carpenter shall drive all stakes, erect all braces and batter boards and do all layout with transit, level or any other means for the purpose of, but not limited to, locating machinery, equipment, bridges, footings, foundations, floors, walls, bolts, columns, partitions,

door bucks, curbs, manholes, excavations, etc.

2.      On larger jobs such as power plants, dams, bridges, housing, projects, or any other job where it is necessary to have a full-time crew for layout, line or grade work, the following will apply:

(a)     A carpenter foreman or company supervisor shall supervise and direct members of the unit on any one job. He shall be directly responsible for the layout from specifications and plans to the direction and actual performance of the layout.   He shall read plans and specifications, make sketches for performance of layout, develop and maintain survey records, do the necessary computations, control the layout of the job and be able to do the required duties of any member of the unit. He shall direct employees in the unit.

(b)     Carpenter journeyman under the directions of a carpenter foreman or company supervisor shall perform layout and run the instrument in a party. They shall set up, operate and make minor adjustments, read plans and sketches, and keep surveying records.

(c)     Carpenter journeyman or apprentices, if available, shall hold the rods and generally assist in doing layout.

3.      The Union agrees to include in its Apprentice and Journeyman Training programs instructions in the use of the transit, level, theodite, piezometer lazer when used as an instrument and other related instruction in the field of layout, line and grade work so that a sufficient number of properly trained employees will be available to the employer at all times.

4.      It is agreed that the aforementioned layout work will be assigned to employees covered by this Agreement and not to any other craft.

5.      The contractor reserves the right to employ a Licensed Professional Engineer or Land Surveyor for establishing basic location of buildings, for making certified surveys, and for protecting the employer from liability for improper layout.

6.      It is understood the Union will allow mobility or freedom of movement within the State of New Jersey for layout personnel or crews. It is further agreed that the size of the layout crew will be determined by the employer. The Union does not concede any rights it may have now or in the future to perform layout work on off-site roads or to represent those who do. It is, however, not the intent of this Agreement to cover road work. It is understood that bridges or other structures built along the roadway where employees are employed are not to be considered road work.

7.      It is further agreed that said tasks may be performed to the same extent, and under the same circumstances and under the same direction as in the past, by the employer or his management personnel.

## ARTICLE XXXVI
## MISCELLANEOUS:

1.      All employees shall receive a ten-minute coffee break in the morning.

2.     Tools supplied by the Contractor shall be returned by the employees using same or by employees that are assigned to this duty by the Employer.

3.     A five-minute clean-up time to be allowed before the scheduled lunch and quitting time for covered employees.

4.     When employees are requested to work in foul weather, or conditions caused by same, foul weather gear shall be provided by the employer (Jacket, Pants & Boots).

5.     The union shall make every effort to comply with owner or contractor mandated drug testing and/or background screening requirements.

6.     The Union, in cooperation with the Management and Labor Trustees of the Carpenter Benefit Funds, shall implement a program to provide to management and retain for its records the necessary forms required by agencies of the Federal Government in connection with referral of apprentices, journeymen and foremen by the Union.

7.     No project labor agreement (PLA) may supersede this agreement or any of its provisions or articles without the mutual consent of the parties. Further adding that a representative of the Employer Associations may participate in any PLA negotiations.

8.     Carpenters and millwrights will be able to perform duties as assigned by the employer.

9.     In the event of false/positive drug testing resulting in retesting, if the employee's results are found to be negative, the employee will be compensated for lost work.

10.     A committee consisting of Labor and Management representatives shall be established to develop a Drug and Alcohol policy and program which will provide for testing      of current employees, pre-employment testing and random testing. The policy and program, once it is adopted, will be part of the Collective Bargaining Agreement.

11.     Any employee working under the terms and conditions of this Agreement is not entitled to paid sick leave established under a state, county, city or local ordinance provided that said ordinance excludes employees working under the terms and conditions of a collective bargaining agreement.

## ARTICLE XXXVII
## PICKET LINE:

The Employers' employees represented by the Union, reserve the right to refuse to cross any other Union's legal picket line and also reserve the right not to cross any illegal picket line where doing so might result in the infliction to them of bodily harm or where such result is reasonably to be anticipated or where threats of a verbal nature are made, from which they may reasonably infer that they may suffer bodily harm or damage to their property and neither of such refusals shall make the Union or its representatives or the members of the Union responsible in law or in equity or before any Federal or State Administrative Agency having jurisdiction over the

subject matter.

## ARTICLE XXXVIII
## ACCIDENT OR SICKNESS:

Should any employee be taken sick or meet with an accident while at work, the employer shall see that he is properly cared for. The shop steward shall take charge of his tools during his absence and notify the Business Representative. This is to be done on the employer's time; however, the steward shall do so at the least possible loss of time. Any employee who is hurt on the job and has to leave shall be paid for the full day.

## ARTICLE XXXIX
## CALL OUT PAY:

1.     Any employees reporting to the job and not being put to work for any reason other than inclement weather or circumstances beyond the control of the employer shall receive one (1) hour pay. Employees who start work shall be guaranteed pay to the next half hour if work is stopped. Such guarantees shall be applicable to shift work also. The employee must remain on the job during this time he is being paid.

2.     Any new employee reporting for work at any time in the morning after agreed to starting time shall be guaranteed four (4) hours work, weather permitting work. If a new employee starts or continues to work in the afternoon, he shall be guaranteed eight hours work under all circumstances. In no case shall employees put their tools on the job in advance of being hired. This shall not apply to a temporary layoff when the same employees are later put to work nor if the employees who are regularly employed are absent on the previous day. After making a determination not to work, the employees shall leave the job immediately following the time for which they had been guaranteed work, as per Article XXIII, No. 6.

3.     There shall be no penalty on the employees for any decision not to work because of weather. This shall not apply to emergency work or employees working undercover at said time. Emergency work shall mean that work which would be performed in order to prevent danger to life or property.

## ARTICLE XL
## RECOGNITION OF MILLWRIGHT WORK COVERED:

A.     The following terms and conditions shall only apply to millwright employees and millwright work covered by the terms of this Agreement.    Where the terms of this Article conflict with another provision of this Agreement, the terms of this Article shall apply to millwright employees and millwright work.

B.  JOINT COMMITTEE:

A joint labor/management committee "Joint Committee", consisting of two representatives from millwright contractors appointed by the Associated Construction Contractors of New Jersey (ACCNJ) and the Northeast Millwright Contractors Association (NEMCA) and two representatives appointed by the Executive Secretary/Treasurer of the Eastern Millwright Regional

Council (EMRC), shall be formed to address contract issues and meet on a quarterly basis and, if necessary, at the call of the Co-Chairs of said committee. The Co-Chairs will be appointed by the respective side.   By unanimous agreement, the Joint Committee shall have the authority to implement contract changes within the term of this agreement. The Joint Committee shall address jurisdictional issues that arise during the term of this agreement. By unanimous agreement, the Joint Committee shall have the authority to negotiate terms and conditions of a residential agreement.

### C.  REFERRAL PROCEDURE:

Not excluding the provisions provided for in Article XVI-Portability, the Employer agrees to give the territorial Millwright Local Union hiring hall first opportunity to furnish competent and qualified journeymen and apprentices upon the Employer's request and the Millwright Local Union agrees to supply such craftworkers. When the Millwright Local Union does not furnish qualified employees within 48 hours (Saturdays, Sundays and Holidays excluded), the contractor shall be free to obtain employees from any Millwright Regional Council Local Union.

### D.  TERRITORIAL JURISDICTION:

This Agreement shall cover Local 715 Millwrights (New Jersey/Statewide) that is part of the Eastern Millwright Regional Council ("EMRC").    The EMRC covers New Jersey, New York, Maine, New Hampshire, Vermont, Massachusetts, Connecticut, Rhode Island, Pennsylvania, Delaware, Maryland, the District of Columbia, Washington and Athens counties in Ohio, Bertie, Camden, Chowan, Currituck, Dare, Gates, Hertford, Northampton, Pasquotank and Perquimans counties in North Carolina, West Virginia, and Virginia.

### E.  WORK JURISDICTION:

The term "Millwright" and Machinery Erectors shall mean the unloading, hoisting, rigging by any means, transferring, moving, cleaning, disassembling, assembling, welding, burning, erecting, calibrating, aligning, starting-up and testing, adjusting, repairing, and the maintaining of all machinery and equipment, be it powered by, or receiving power from, steam, gas, gasoline, diesel, jet, electric, pneumatic, water, solar, thermal, mineral, atomic, rocket, nuclear, chemical, wind or any other source, regardless whether temporarily or permanently installed or located and shall also include the following work:

Although some components of machinery and/or equipment may be described in one application or location and not in another, it shall not be excluded from our autonomy when, to avoid repetition, it is not described in other applications, any change in technology or materials that replace an application that falls under Millwright jurisdiction shall be deemed the work of the Millwrights.

Some of the locations in which you may find machinery, equipment and their components are: woodworking, canning, food, and computer industries, steel, metal, plastic, and glass manufacturing or recycling plants, foundries, ore reduction plants, stamping facilities, coffee roasting plants, paper, cellophane and film industries, feed and saw mills, rock, gravel, sand washing, stone crushing, cement and asphalt plants, water, sewage and chemical treatment plants, laundries, kitchens, restaurants, hospitals, bakeries, fertilizing and mixing plants, can, ice, bottle

and bag manufacturing plants, textile, flour, and paint mills, breweries, milk, rendering and meat processing plants, locks, dams and bridges, coal yards, sugar refineries, ethanol or similar type facilities, bio-mass facilities, cosmetic facilities, pharmaceutical facilities, post offices, package handling centers, incinerators, co-generation, coal gasification and power plants, automotive, truck and or similar manufacturing type factories, maintenance facilities for cars, trucks, trains, planes, buses, bio-research facilities, the amusement, recreational and entertainment fields, semi-conductor plants, clean rooms and wind farms, all mechanical equipment on submarines and ships either assembled, semi assembled, disassembled or maintenance of is the work of the Millwright.

1. Unloading, hoisting, rigging, dismantling, processing, erecting, assembling, cleaning lining, aligning and adjusting of all machinery used in the transmission of power, in building factories, or elsewhere, shafting, bangers, gears, sprockets and chains, belting and all other drives necessary to the transmission of power, truck bumpers, telescopic seals at truck terminals, load levers and Kelly type docks.

2. Millwrights shall set all engines, motors, dynamos, generators, diesel generators, motor restraints, install, measure and align with optical instruments when necessary the reactors, control, push and shut-down rods, rod pressure housing, drives, guide sleeves and other related equipment in reactors, turbines, castings, combustion chambers and all its related components, the attachment of the inlet manifolds and exhaust ducts, cylinders, diaphragms, rotors, blade rings, blade or bucket assemblies, hydrogen coolers, blower assembles, packing joints on hydrogen coolers, exciter or Alterex and all others, turning gear, extension box, welding of extension box, lagging, stretching of coupling bolts or others, perform oil flush, install turbine lube oil tank, pumps and related component skids, filters, thrust bearings, the sweating on and shrinking of bearings, couplings, shafts and others, sole plates and machine bases, perform precision grouting integral to the setting of machinery, using the following materials, epoxy, wet, non-shrink, dri-packing or other types, demineralizing, hydromation and mechanical dust systems, sensors, air compressors, super chargers, coolers, boiler controls and linkage, Bailey Meters or similar devices and their linkages, fluid drives, embedded guides for traveling screens, traveling screens, roller, slide, knife, lock and sluice gates, limit torques on mechanical valves, gates and others, tainter valves, limit switches, trips, triggers or switches including the brackets that are attached to, stop logs, dam rollers, transfer cars, gear head motors, lifts, guns and gun mounts, the skidding and unskidding and crating and of all machines, shall be the work of the Millwrights.

   Setting of all motors and pumps and putting on all pulleys, sheaves and flywheels for same; and setting of all worm or gear drives directly coupled to motors; and the making and setting of all templates and any re-work of the above either on site or the removal of pumps for rework off site.

3. All coal handling machines and drives; crushers, conveyors, and drafts, whether the frames be of steel or wood; and all necessary supports shall be assembled by millwrights except such as are to be fastened by hot rivets. The framing and drilling of all work hoppers as handling machinery either elevated or conveying. All burning and welding of same.

4. Stone crushing and gravel washing plants, crushers, screens, revolving or eccentric, rolls, fan conveyors, all conveyors, belt, chain, screw, whether boxes be of steel, iron or wood. The assembling of all train rails, mono rails, overhead cranes or all travelers where no hot rivets are used in assembling same.

Setting all beams or timbers used in the reception of machinery and drilling of holes, necessary for the foundation whether they be of wood or steel, stone, concrete or other materials, whether ratchet or power drills are used. The erection and dismantling of machinery conveyors except that temporary or portable installations pertaining to Heavy and Highway construction is excluded.

5. All grain handling appliances, cleaners, clippers, needles machines, car pullers and grain shovels. The manufacture and erection of wood leg, spouts and conveyor boxes.

6. The erection of steel and/or cast-iron legs, heads or roots and conveyor boxes, framing of all marine legs and ship shovels and the framing of all scale timbers. Setting of all scales, tract hopper or automatic, all boot tanks, receiving hoppers and devices used for elevator legs when not electrical appliances.

7. All bin valves, turnheads and indicators, all necessary shafting bearing and supports, all drives, rope belt, chain or rawhide, all pulleys, cable sprockets or gearing and the cutting of all key seats and valve lapping and fitting all machine surfaces in new or old work in the field.

8. All sewage disposal machinery and coffee roasting plants.

9. All amusement devices of all kinds; all animation and mechanical exhibits that are used in expositions and fairs, all turntables in expositions, fairs, gas stations and garages, all barrel or package devices either elevated or conveying; all presses, hydraulic or otherwise.

10. All direct or connected machinery of any power hog hoist and meat handling machinery, all spice or flour or cereal mills, or cotton, wool, silk, twine, paper, saw, cement, planing, powder and paint mills, machinery and woodworking shops or factories, jewelry and powerhouse machinery, sugar refineries, starch house, bakeries, fertilizer breweries, and shoe factories. All ice plants and equipments, ice cream factories and laundries, knitting mills and power sewing machines. Finally, all work pertaining to machinery used for manufacturing purposes or amusement devices which will come with the evolution of time and this craft will come under this jurisdiction claim, and all burning and welding involved.

11. Sewage and Water Treatment Plants-disassembly, fabricating, rigging, erecting and aligning of skimmers, rake mechanisms, feed wells, baffles, scum troughs, degritting equipment, bar screens, communitors, mixers, pumps, aeration systems, blowers, membrane filtration systems, sequencing batch reaction systems, including any related piping or duct work, filter presses, sand filtration systems (excluding the filtration media and associated earthworks), ultra violet rack

33

systems, mechanical drive assemblies, conveyors, mono rails, gates and setting odor control equipment, (excluding heating, ventilating and air conditioning work or associated earthworks).

12. The setting of thru-clean bar, straight line bar, trash, tritor drum, and disc screens, straight line grit, circuline grit, circuline sludge, and circuline mixer collectors, straight line, flash, horizontal slow, vertical slow, and vibra flow feeder machines, pre-aeration and settling tanks, covers for tanks, bowls and basins including stationary or mechanical covers regardless of materials, thickeners, rotoline distributors, sludge bed cleaners, digestion systems, heaters, dyna-grind sewage screening grinders, screw pumps, spiral classifer, agitators, junk remover, hydro pulper, cooling fans, lube systems, selectifier screens, hydrosensors, fuel blowers, grizzly screens, trommels, table feeders, dryers, optical sorters, high tension separators, grip dewatering screens, flash mixer, horizontal slow mixer, vertical slow mixer, vibra-flow feeder machine, circuline grit collectors, pre-aeration and settling tanks, circuline sludge collectors, circuline mixer collectors, grip dewatering screens, filter, cone and rotary presses, comminutors, barminutors, degreasers, rotometers, dehumidifiers, benches, washers for cars, trucks, buses, trains and other types, hydraulic units, shroud boxes, silencers, scales, load cells, eddy current clutches, disintegrators, dehairing machines, grain handling devices, laboratory equipment, machine shop equipment, ladle cars, stunning pens and doors, activation equipment, racks, material handling platforms, transition pieces, the handling and installation, of pulleys, gears, sheaves and fly wheels, air vacuum, worm, belt, friction, rope, chain and gear drives that are directly or indirectly coupled to motors, belts, chains, shafts, or screws, installation of legs, boots, guards and boot tanks, all bin and diverter valves, turn hands and indicators, shafting, bearing cable sprockets, cutting of all key seats in old and new work, troughs, chippers, calendars, rolls, winders, rewinders, slitters, cutters, wrapping machines, blowers, forging machines, pneumatic, electric and hydraulic rams, extractors, expellers and extruders, ball and dust collectors, splicing of ropes and cables.

13. The laying out, fabrication and installation of protecting equipment including: machinery guards, making and setting of templates for machinery, fabrication of bolts, nuts, pans, drilling of holes in machinery for any equipment which the Millwrights install regardless of materials, all welding and burning regardless of type, fabrication of all lines, hose or tubing used in the lubrication, operation, cooling or heating of machinery including the installation of all fluids used to operate, lubricate, cool or heat equipment installed by Millwrights, cleaning of machinery before turnover to owner, machining, grinding, milling, broaching, boring, threading, lapping and keying that may be necessary for any part of equipment, including the starting up, breaking in, trial running and operational or functional testing of any equipment or machinery installed by the Millwrights.

14. When optical instruments such as automatic levels, builders' transits, precision jig transits, tilting levels, theodolites or other precision tools and instruments are used to locate and set machines, these tools are considered a tool of this trade and are to be used by Millwrights to set their equipment.

15. Rock, sand and gravel plants, batch or aggregate plants, recycling equipment, crushers, conveyors, chutes from one piece of mechanical equipment into another piece of mechanical equipment, or from a vessel into a conveyor, or into other places or mechanical equipment or other mechanical equipment used (for the purpose of description only) to excavate material from one area to another from highways, roadways or elsewhere.

16. Asbestos removal on equipment in which Millwrights normally remove during maintenance and repair work. (Removal shall be allowed by the Union whose members have been educated and trained in the safe removal of asbestos materials and have a Connecticut State Certified License for asbestos removal.) Any new equipment or technology designed to replace any of the equipment described above shall remain in the jurisdiction of the Millwrights.

17. All welding and burning connected with Millwright work as defined herein.

18. The setting of variable drives, fans, coal cranes, truck cranes or other types, including servicing and the adjusting and aligning of mechanical equipment within the cranes, crane rails and all other types of rails which would carry mechanically activated equipment, including their alignment, monorail (all sizes), trolleys, pumps and their associated components, packaging equipment, refrigerating equipment, chillers, and related equipment, lantern rings, packing glands, packing for pumps, pollution equipment, carbon absorbers, heat exchangers, grain, ball, hammer, roller mills and other, crushers and beaters, hoppers, bins chutes and spouts, turn tables, shears, casing machines, robots, air conveyors, conveyors of all sizes, types, and styles regardless of the materials they are constructed with, including their supports, people movers, jetways, magnetic separators, hoists, feeding machinery, Z-loaders, S-loaders, palletizes, Triax equipment, mechanical equipment in scrubbers, pack towers, precipitators, cooling towers and air cooled condensers.

19. With respect to the new jurisdictional language added to Article X(B) in the 2013 Agreement and for Association contractors only it shall not be a violation of this Agreement if an Employer assigns work defined in Article X, Section B/Millwrights to another recognized building trades union, where the work in question is within the recognized and traditional jurisdiction of another Union with which the Employer has an Agreement and where the Employer has a history of using another building trade to perform the work in question.

20. On Millwright jobs with twenty (20) or more employees, the employee shall be granted ten (10) minutes wash up time before lunch.

21. Millwright Employers shall furnish all Millwright tools not itemized below. When a tool crib is in use by the Millwright Employer to house Millwrights' tools, if it is staffed, it shall be staffed by a Millwright.

The following list of Millwright tools may be required by the Employer to be furnished by the Millwright Employee: 1 metal tool box -1 one inch outside

35

micrometer -1 set of standard feeler gages - 1 shaft level - protractor combination square - set 3/8" drive sockets - set 1/2" drive sockets to 1 1/4" - set open end and box wrenches 3/8" to 1 1/4" Wescott 6", 8", or 12" - ball peen hammer 16 or 24 oz. - set screw drivers and Phillips - 18" level Torpedo level - complete set of Allen wrenches to 3/8" or 1/2" - flashlight - pair side cutters - pair channelocks - pair vise grips - 6' ruler - flex tape 12' - scraper - center punch - hack saw frame-plumb bob-dividers 6" or 8" - utility knife - cold chisel - magnet - mirror - scriber - tin snips - 6" scale - 2 drift pins 2 tap wrenches - chalk line-pry bar.

Employers requesting Millwrights, shall specify the nature of the work to be performed so only the tools required for the work will be on the job site.

The Employer shall be responsible up to a maximum amount of $1250 for the loss of an employee's tools by fire or theft while stored in such shed after working hours, provided that an inventory of such tools has been pre-filed with the Employer. In case of theft, the Employer shall be liable only upon evidence of forced entry.

22. For millwright work, the Millwright Council and Local 715 recognize the threat of non-union competition and will do all possible to promote union millwright construction, including holding pre-bid and/or pre-job conferences on an individual job basis to mutually agree on ways to enable the Union Employers to be more competitive with non-union Employers. The parties recognize the threat of unfair competition in certain areas and types of work from contractors who do not conform to the standards provided in this collective bargaining agreement. In order to address that problem, the Employer may request relief from certain provisions of this collective bargaining agreement. The Employer shall contact the Executive Secretary-Treasurer of the Millwright Council or his designee to discuss the relief being requested. If an agreement on relief is granted, it will be reduced to writing, and reasonable efforts will be made to advise other signatory contractors who are bidding on the project of the relief and will notify the Associations. It is expressly understood that no modification or deviation may be made from the existing collective bargaining agreement except by mutual agreement of the parties. It is further understood that failure to reach an agreement under this provision shall not be subject to arbitration. It is the intent of the parties that this procedure will be utilized where circumstances warrant and that the Employer will not abuse this procedure. Procedures shall be established by the Executive Secretary Treasurer or his or her designee to notify all contractors of the changes, which have been granted for that particular job.

23. Offshore Work. All work involving travel offshore to a work site , including but not limited to, the unloading, hoisting, rigging by any means, transferring, moving, cleaning, disassembling, assembling, welding, burning, erecting, calibrating, aligning, setting, starting-up and testing, adjusting, repairing, and the maintaining of all turbines, castings, combustion chambers and all its related components, be it powered by, or receiving power from, steam, gas, gasoline, diesel, jet, electric, pneumatic, water, solar, thermal, mineral, atomic, rocket, nuclear, chemical, wind or any other source, regardless whether temporarily or permanently installed or

located, as well as any other related work for oil, gas, wind and/or any other natural resource exploration and drilling facilities. regardless of location within the state of NJ and/or federal waters from the NJ shoreline.

F.   SHIFT WORK:

1.   When so elected by the Employer, multiple shifts on a temporary basis of at least five (5) consecutive days duration may be worked. Any period of time less than five (5) consecutive work days may be considered shift work if mutually agreed to by the Union and the Employer.

2.   When a two-shift schedule (including a day shift) is established, the first or day shift shall be established on an eight (8) hour basis. The second shift shall be established on an eight (8) hour basis and paid the base rate plus 15%.

3.   When a three-shift schedule is established, and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The day shift shall be established on an eight (8) hour basis, the second shift shall be established on a seven and one-half (7 ½) hour basis, and the third shift shall be established on a seven (7) hour basis. The first shift shall receive the base or regular hourly rate. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

4.   When there is no day shift and a second shift or third shift is established and mutually agreed to by the Employer and the Union, the following conditions shall prevail. The second shift shall be established on an eight (8) hour basis. The third shift shall be established on an eight (8) hour basis. The second shift shall receive the base hourly rate plus 15%. The third shift shall receive the base hourly rate plus 20%.

5.   When an irregular shift must be established, the percentage premium shall be 15% above the base rate.

6.   The percentage premium, when added to the base rate, shall be termed the regular hourly rate.   Shift hours for the second and third shifts shall be such as to conform to the day shift and in no case shall an employee work on more than one shift within a 24-hour period.

7.   Separate safe and suitable rooms or lockers for the security of the employees' tools and clothing shall be provided for the employees of each shift.

8.   When the Department of Labor does not include the shift premium in the prevailing wage rate schedule, the shift work premium will be waived.

9.   All time worked before and after a regularly established shift shall be paid at the applicable overtime rate. When a portion of a regular established shift works into Saturday, Sunday or a Holiday, that time worked shall be paid at the established shift rate.

G.    SHOP STEWARD:

1.  The Executive Secretary-Treasurer or his designee having jurisdiction over the job, will select a certified Shop Steward. A Shop Steward shall always be employed whenever covered work is being performed on any job, except at the end of the job when punch list work is being performed by one employee which does not exceed three (3) days. The steward's employment may be terminated by the Employer after review of complaint against him between the employer and the Business Representative. In the event of a disagreement between the Business Representative and the employer, the complaint shall be referred to the Executive Secretary-Treasurer or his designee for whatever internal actions considered appropriate. A Shop Steward can be appointed from an employer's regular complement of employees, with the consent of the Union, providing he has the appropriate training certifications from the Eastern Millwright Regional Council's shop steward certification program, and who otherwise meets all of the Union's requirements for appointment as a shop steward. Should the Union have due cause to replace the shop steward, they will notify the employer, defining the reasons for said replacement. In the event the Union appoints a shop steward on a small job from a group of key company personnel and that steward fails to fulfill his duties, he will be immediately removed from the position and replaced by the Union.

2.  The Shop Steward must 1) report to the Local Union prior to the start of the job to pick up the appropriate paperwork and instructions; 2) fill out the appropriate paperwork; and 3) deliver the appropriate completed reports to the Local Union hall after the end of the workday on Friday of each week. The Shop Steward shall only take the necessary time to perform his duties to the best interests and safety of the covered employees. There shall be no non-working Shop Stewards and the Shop Steward shall not be permitted to leave the job for the performance of his duties unless by the consent of the Employer.

3.  The Shop Steward shall have no authority to call any strike or stoppage of work or to make any Agreement which changes, modifies or alters any of the terms and conditions set forth in this Agreement.   The Shop Steward shall be given two hours notification before an employee is laid off. The employee shall be given one-hour notice of layoff. In the spirit of cooperation and as a courtesy, the employer will make every reasonable effort to notify the Business Agent twenty-four hours in advance to laying off six or more employees at one time.

4.  The Shop Steward shall not be discriminated against for attending to his or her duties.

5.  In the event the Union appoints a shop steward on a small job from a group of key company personnel and that steward fails to fulfill his duties, he will be immediately removed from the position and replaced by the Union.

H.    MILLWRIGHT FOREMAN:

1.  Where there are two (2) or more millwright employees on the job, there shall be a

38

foreman. Thereafter, the determination of the number of foremen and general foremen are the sole responsibility of the employer.

2. All foremen shall be "working foremen" at the discretion of the employer.

3. On jobs exposed to inclement weather conditions, the duration of which jobs shall be of 10 or less working days exclusive of days lost by reason of inclement weather, and where there are less than 3 carpenters employed thereon, the foreman shall not receive pay for intervening inclement weather days or holidays. In the event that such jobs exceed 10 actual working days exclusive of holidays and days lost by reason of inclement weather, the foreman's usual pay requirements shall be retroactive to the commencement of the job.

4. Except as provided for in paragraph three (3) above, all foremen, including the general foremen, shall be paid for the prevailing regular weekly basis for all normal working days between the initial date of employment and the termination date of employment, holidays and inclement weather days included, provided however that all foremen must report to work every day within the work week unless otherwise directed by the Employer. All overtime worked by foremen shall be compensated for at proper overtime rates.

I.  APPRENTICES:

Millwright apprentices shall be paid the following scale of wages:

| | |
|---|---|
| 1st 6 months | 40% of the journeyman's rate |
| 2nd 6 months | 45% of the journeyman's rate |
| 3rd 6 months | 50% of the journeyman's rate |
| 4th 6 months | 55% of the journeyman's rate |
| 5th 6 months | 60% of the journeyman's rate |
| 6th 6 months | 65% of the journeyman's rate |
| 7th 6 months | 70% of the journeyman's rate |
| 8th 6 months | 75% of the journeyman's rate |
| 9th 6 months | 85% of the journeyman's rate |
| 10th 6 months | 95% of the journeyman's rate |

Effective May 1, 2020, the Millwright apprentice pay schedule shall be as follows:

| | |
|---|---|
| 1st Year | 40% of the journeyman's rate |
| 2nd Year | 55% of the journeyman's rate |
| 3rd Year | 65% of the journeyman's rate |
| 4th Year | 80% of the journeyman's rate |
| 5th Year | 90% of the journeyman's rate |

During the term of the Agreement, an equal number of representatives from the Associations (Associated Construction Contractors of New Jersey and Northeast

Millwright Contractors Association) and the Union will meet to discuss creation of "Intermediate Journeyworker" Millwright classification. Subject to necessary trustee and/or DOL approval, parties agree to implement any mutually agreed-upon terms.

J.   **TRAINING, SAFETY & ADVANCEMENT FUND:**

Effective May 1, 2019, and continuing thereafter, each Employer bound by this Agreement shall contribute $.33 per hour for each hour of millwright work covered by this Agreement to the CITF/Associations Health Safety Industry Funds, of which $.15 shall be allocated to the UBCJA National Safety and Health Programs; $.12 allocated to the ACCNJ Industry Fund; and $.06 to the NEMCA Industry Fund.   Northeast Carpenters Fund office shall collect and distribute such funds.

## ARTICLE XLI
## RECOGNITION OF HEAVY AND HIGHWAY WORK COVERED:

1.   This agreement shall cover all road, railroad, highway and heavy construction. Heavy construction is defined as: construction and alteration of sewage disposal plants, filtering plants, all work performed under compressed air, offshore plants, offshore terminals, foundations, pile driving, pile capping, forms and similar activities, piers, abutments, retaining walls, viaducts, water crossings pertaining to pipeline work, shafts, tunnels, subways, track elevations, elevated highways, reclamation projects, sanitation projects, aqueducts, irrigation projects, water power development, hydroelectric development, transmission lines, locks and dams.

2.   In addition to all aforementioned articles of this agreement, the following conditions shall apply to the work outlined above:

A.   Lying within the jurisdictional boundaries of the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC), all layout duties for any highway project shall be as follows:

(aa) The survey crew shall lay out and stake the base line and bench marks of the project involved. They shall further locate horizontally and vertically each structure and its significant parts on such project.

(bb) The day to day layout necessary to construct forms and locate necessary points for line, elevation and anchor bolts from original points, is the work of the Carpenters.

(cc) The Employer agrees that the transit and level are tools of the construction trades and will furnish same to the employees when needed for the performance of work normally performed by the employees.

B.   The jurisdiction over the erection of earth walls and sound walls shall be determined by area practices and contractor assignment; the area being the seven southern-most counties in New Jersey, starting with the northern most border of Burlington County.

C.   By mutual agreement, the starting time may be flexible from 6:00 a.m. to 9:00 a.m.

with a flexible one-half hour lunch period that will take place in the time frame that begins three hours after the start of the work day and ends two hours prior to the end of the work day.

D.    The employer shall assign work on the basis of traditional work jurisdiction lines. It is, however, recognized that on some jobs effective production will require the use of composite crews. When such circumstances exist and the other basic trade unions have agreed, by mutual agreement the employer shall discuss the work involved and the make-up of the crews on the basis of the amount of work involved for each union. In the performance of such work, all employees will perform the work they are assigned.

## ARTICLE XLII
## RECOGNITION OF INTERIOR SYSTEMS WORK COVERED:

1.    The Employer agrees to recognize that this agreement shall cover the installation of all materials and component parts of all types of ceilings regardless of their materials composition or method or manner of their installation, attachment or connection, including but not limited to the following items: all hangers, support components, cross furring, stiffeners, braces, all bars regardless of material or method of attachment, all integrated gypsum wall board ceiling heat panels, or wall board panels to receive radiant heat fill, all main tees, splines, wall and ceiling angles or moldings, all backing board and all finish ceiling materials regardless of method of installation.

2.    All work in connection with the unloading, handling, installation erection and/or application of all materials and component parts of moveable, demountable or stationary, walls and partitions regardless of their material composition or method or manner of their installation, attachment or connection, including but not limited to the following items: all floor and ceiling runners, studs, stiffeners, cross bracings, fire-blocking, resilient channels, furring channels, doors and windows including frames, casing, moulding, base accessory trim items, gypsum drywall materials, laminated gypsum systems, backing board, finish board, gypsum fireproofing of beams and columns, gypsum fireproofing of chases, sound and thermal insulation materials, fixture attachments including all layout work, preparation of all openings for lighting, air vents or other purposes, and all other necessary or related work in connection therewith.

3.    In addition to all aforementioned articles of this agreement, the following conditions shall apply only to the work outlined above:

A.    Foreman: The selection of the foreman shall be the sole responsibility of the Employer. The foreman shall be the first and last employee on the job. The foreman shall give orders directly to the employees. The determination of the size of work force to be supervised lies exclusively with the Employer. The foreman shall carry out his duties as a representative of the Employer and may work with his tools so long as he is a member in good standing of the United Brotherhood of Carpenters and Joiners of America.

B.    Make-up Day: In the event conditions on the job, beyond the reasonable control of the Employer, prevent the work from proceeding on any regular workday (Monday through Friday), the Employer and the Union shall have the right due to inclement weather or other mutually agreed upon reasons to a make-up day on Saturday at straight time wages.

41

C.    When work to be performed in occupied buildings is of such a nature that it is not appropriate or practical during the regular work days such as renovation, alteration and modernization; such work shall be performed at the time suitable, designated by the owner. Contractors utilizing this provision shall notify the Union prior to commencing work. Such employees shall receive their regular hourly rate working seven and one-half (7 ½) hours and being compensated for eight (8) hours' work. When any employee works over seven and one-half (7 ½) hours under these conditions in any 24-hour period, the time worked shall be considered overtime and such compensation shall be at one and a half times the regular rate of pay.

D.    In the event that a majority of the other related construction trades on the job have a different or longer workday than the Carpenters' workday under the applicable agreement, the Employer may, by consultation and agreement with the Union, conform the workday to the other trades without payment of premium wages.

E.    When more than one shift is required, the first shift shall be at regular rates of pay. The second shift shall work seven and one-half (7 ½) hours and receive eight (8) hours' pay and the third shift shall work seven (7) hours and receive eight (8) hours' pay. No employee shall be required to work more than one shift during a 24-hour period at shift rates.

### ARTICLE XLIII
### RECOGNITION OF FLOOR LAYING AND FINISHING

1.    The Employer agrees to recognize that this agreement shall cover any and all methods for the installation and removal of the following: carpet, carpet tile, wall carpet, linoleum, wall linoleum, cork, matting, protective wall matting, cushioned wall covering, lino-tile, rubber tile, tread-like tile, sheet vinyl, vinyl tile, and all other tiles, all resilient floor coverings, new or old, any related products customarily installed on any vertical, horizontal or any other surface: tile composed of marble or synthetic chips embedded in resin, needle punched, tufted grass or synthetic indoor/outdoor coverings, all athletic track and court materials, PVC-rigid type wall and ceiling systems, poured seamless flooring, rubber/vinyl, or similar type wall base, the cleaning of carpets, laying of all hardwood floors, nailed or mastic set, parquet and wood type tiles, and block floors, acrylic impregnated and radiated wood flooring, and all types of epoxy resin installations; engineered floors and other laminated floors, the sanding and finishing,    game lining, striping, lettering, logoing, screening, and recoating of hardwood floors, the staining, dyeing, polishing and waxing of concrete floors, the preparation of all existing floor and wall surfaces whether pumped, poured or troweled or mechanical preparation, as required to prepare for finished floor or wall covering or in any other manner to correct cracks, roughness, indentations, unevenness, leveling, transitions and the like; and the fitting of edge strips on steps and at openings for the protection of all aforementioned floor, wall and ceiling coverings, Channel, stair nosing and carpet edge to receive electric tubing in conjunction with floor products, the cleaning and waxing and all types of temporary protective cover of all flooring required at the time of installation, the handling, lifting, stocking, unloading or moving of any flooring or floor wall, or ceiling covering materials on the job site, whether done by physical, mechanical or motorized means, unless otherwise provided for by the manufacturer or supplier, and all other work pertaining to installation of carpet, wood, resilient and similar type floor coverings. Self-leveling engineered cement and any other product for this application, use of shot blast machines to prep slabs, game lines and art work

applied on hardwood floors and all sanding and finishing, resilient terrazzo tile, removal of all flooring materials for installing new floors, including operation of all machinery for this purpose. The surfacing and resurfacing of sports floors and game courts (i.e. Basketball, Volleyball, Hockey, Tennis, Running Tracks, Multi-Use and Playground) to include the layout and application of gaming lines for interior and exterior applications. The use of applicators (associated equipment & accessories) to mix and/or spread the coatings of material. The preparation of the surface to receive these coatings (patching, sanding, washing). Moisture mitigations systems and remediation by whatever means for products handled and installed by Carpenters covered under this Agreement.

     2.    In addition to all aforementioned articles of this agreement, the following conditions shall apply only to the work outlined above:

    A.  In order to be recognized as a qualified Employer and eligible to sign the Agreement, said Employer must have an established place of business, financial responsibility and employ at least one mechanic. The place of business must be investigated by the Business Representative and upon his recommendation that the Employer satisfies the criteria specified in this Agreement and upon approval by the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC), the Employer shall be considered eligible to sign this Agreement. Associate companies, partnerships, corporations, persons or other entities shall be considered as one where the purpose is to avoid this provision.

    B.  A joint labor/management committee (hereinafter "Joint Committee"), consisting of two representatives appointed by ACCNJ, two representatives appointed by the Floor Covering Institute of New Jersey and four representatives appointed by the Executive Secretary/ Treasurer of the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC) shall be formed to address contract issues and meet on a quarterly basis.   By unanimous agreement, the Joint Committee shall have the authority to implement contract changes within the term of this agreement.

    C.  The employees agree that when an installation is unsatisfactory, the Employer may, within a period of ninety (90) days from the time of installation, report same to the Business Representative of the Local Union who shall endeavor to adjust the matter. If the matter is not satisfactorily resolved, the Employer may provide written notice to the union. If there are two or more incidents with the same employee, the employee will be required to attend Training School for a hands-on re-evaluation.

    D.  All mechanics shall own a complete set of hand tools required for the work as follows:

    (aa) First Year Apprentice: Tool Box, Hammer, #2 Philips Screwdriver, 1/4" Standard Screwdriver, 5 in 1 tool, 100' Chalk Line, Fixed Blade Utility Knife, Carpet Knife, Knife Pouch, 25' Tape Measure, Pliers, Adjustable Wrench, Hand Broom, Patch Trowel 20" x 4", 6" Drywall Knife, 1' x 8" Framing Square, 4" Razor Scraper, Base Adhesive Spreader, Razor Blade Supply (utility blades, carpet blades, 4" razor scraper blades), Auto Light Torch Head, Propane Tank, Tin Snips or Aviation Snips, Pry Bar. The employer will supply the employee with Razor Blade Supply (utility blades, carpet blades, 4" razor scraper blades) and Propane Tank.

(bb) Second Year Apprentice: Carpet Adhesive Trowel, Resilient Adhesive Trowel, Dividers, 2' Framing Square, Underscribes, Carpet Seam Roller, Kicker, (PLUS ALL TOOLS FROM THE FIRST YEAR APPRENTICE);

(cc) Third Year Apprentice: Top Cutter, Loop Pile Cutter, Stair Tool, Awl, White Rubber Mallet, Carpet Wall Trimmer, Resilient Hand Seam Roller (PLUS ALL TOOLS FROM THE FIRST AND SECOND YEAR APPRENTICE);

(dd) Fourth and Fifth Year and Journeyworker STATUS: ALL TOOLS REQUIRED FOR FIRST, SECOND AND THIRD YEAR APPRENTICE.

(ee) Tools may be inspected by the Employer on demand. The Employee shall returnthe Employer's tools upon reasonable demand.    If the Employee fails or refuses to return the tools, the Employer may withhold sufficient monies to compensate for the loss of the tools.

(ff) No other mechanic or other Employee shall be required to transport bulky material in his own automobile.

E.    The Union shall appoint a competent journeyman as a Shop Steward. Employers who are members in good standing of the management bargaining associations signatory hereto shall have a shop steward appointed from their contingent of employees provided those carpenter journeymen are members in good standing of the local union signatory to this Agreement and are regular employees of the Employer.

F.    Employers who are members in good standing of the management bargaining Associations and who have agreed to be bound by this Agreement shall be permitted full portability of workers within all jurisdictions of the Keystone + Mountain + Lakes Regional Council of Carpenters (KMLRC) for all work covered under this agreement.    The Local Union having territorial jurisdiction shall have the right to supply a steward on each job.

G.    Employers must submit monthly to the Union a list of all jobs awarded which shall include the following: name of project, project location, name of general contractor/owner. If the contractor does not abide by this provision of the contract, they will void their rights to all Association member provisions under this contract.

H.    When an irregular shift must be established, the percentage premium shall be 15% above the base rate.    Irregular shifts will be permitted if the end user cannot tolerate disruption of its routine business activity.

I.    All fringe benefits, except the vacation fund, will be paid at a straight time package rate for Local No. 251, covering the counties of Bergen, Essex, Hudson, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union and Warren.    All fringe benefits shall be paid on a percentage of the gross wages for Local No. 251, covering the counties of Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester and Salem.

J.    The layoff provisions in Article XXV of this Agreement are not applicable to Employers who are members in good standing of the management bargaining Associations and who have agreed to be bound by this Agreement provided they are current with the payment of their fringe benefit funds. For these Employers, employees laid off shall be paid within the next regular pay period.

K.    The Market Recovery provisions are to be utilized by members of the Associated Construction Contractors of New Jersey (ACCNJ) and the Floor Covering Institute of New Jersey for "retrofit" work.   The Company and the Union agree that with respect to this Article, the following conditions shall prevail:

(aa) The hourly rate of pay for employees covered by the terms of this Article shall be no less than 75% of the hourly rate established between the Union affiliates and the employees or recognized employer agencies in the locality. The foreman ratio shall be determined by the employer.

(bb) The Company may establish a shift starting time different than that provided for in the applicable Local Union or Council Collective Bargaining Agreements.

(cc) The standard workday shall consist of eight (8) consecutive hours of work scheduled between 12:01 a.m. and 11:59 p.m. with one-half hour designated as an unpaid period for lunch. The standard work week shall be five (5) consecutive days of work, Monday through Saturday. Sunday shall be paid at 1½ times the hourly rate.

(dd) All hours worked in excess of eight (8) hours per day, forty (40) hours per week, or outside of regular shift, Monday through Sunday, shall be paid at the rate of time and one-half (1½) the hourly rate provided for in this Article.   All work performed on holidays shall be paid at the rate of time and one-half (1½) the hourly rate provided for in this Article plus an additional 15% per hour. There shall be no shift premium.

(ee) The employer may, at its option, schedule the work for four (4) consecutive ten (10) hour days, with the fifth (5th) day as a make-up day.   On this schedule, all hours worked in excess of ten (10) hours per day and forty (40) hours per week shall be paid at the rate of time and one half (1 ½) the hourly rate provided for in this Article or as per federal or state law and or any applicable Canadian law, and the same shall apply for holiday work, plus an additional 15% per hour.

(ff) This Article is not intended to be utilized on new construction projects. However, should the company be in a position to bid on a new construction project that is non-union, the Company may request use of this Article.   Prior to the Market Recovery provisions being utilized on a new construction project, a written request from the company, provided by the Union, must be submitted to the Union's Office detailing the reasons why this Article should be used. The Union, upon investigating said request, shall notify the Company whether the request has been granted or denied.

45

(gg) This Article and the Market Recovery provisions shall not apply to work performed by the Company in New Jersey, if the project is subject to any local, state or federal prevailing wage laws.

(hh) Failure to comply with all reporting requirements shall void the ability of a Company to utilize the Market Recovery provisions referred to in this Article.

(ii)   The Joint Committee defined in Section 2, Paragraph B of Article XXXXII, shall meet to establish a scope of work and a wage and fringe benefit package for a new material handler designation and a scope of work and a wage and fringe benefit package for a new maintenance designation prior to June 30, 2016.

L.   One apprentice shall be allowed to every two mechanics or major fraction thereof, regularly employed. However, there shall be no more than three apprentices subject to the foregoing ratio on any one job or project without the prior consent of the Union.

M. All new apprentices will be required to enroll in and successfully complete a standardized training program. This program will be the INSTALL program as developed and taught by the Carpenters International Union or a similar program approved by the Joint Committee and the Joint Apprentice Committee. In addition to the indentured term outlined in this agreement, all apprentices must complete the hours of work and corresponding levels in the training program to receive increases in the scale of wages outlined.

N.   All graduating apprentices and existing journeymen must complete a continuing education regimen in order to receive any wage or benefit changes contemplated by this agreement. This education may come from the INSTALL program or may be a Joint Committee pre-approved program presented by manufacturers, installation and service companies, educational institutions or similar organizations. This continuing education should include product, safety, equipment and installation training. The dates of certification and recertification instruction will be tracked through a "smart card" that will be developed with the oversight of the Joint Committee referenced in this agreement. Each employer will embrace the INSTALL certification program and will be required to employ only employees that are certified INSTALL floor covering installers. The parties shall develop a means by which to provide a financial incentive for journeyworkers to become certified.   Labor and Management shall continue to work together to promote and enforce the requirements for INSTALL certification, including limiting the referral of employees who do not possess the appropriate certifications and working to establish ample training opportunities for members to obtain said certifications.

O.   Knowing that ongoing programs to promote safety in the workplace and seminars on the latest products and installation techniques are of the utmost importance to maintain a healthy, skilled workforce, the Union strongly endorses and will give all needed support to ensure that its members partake in a minimum of ten hours upgrade training and health and safety programs per year to attain and/or maintain certification.

P.   For Local No. 251, statewide, there shall be appointed by the Employer, a foreman for

46

each job on which there are four or more carpenters employed.

Q.    All foremen shall be "working foremen" at the discretion of the Employer.

R.    **TRAINING, SAFETY & ADVANCEMENT FUND:**
Effective May 1, 2019, and continuing thereafter, each Employer bound by this Agreement shall contribute $.34 per hour for each hour of work covered by this Agreement to the UBCJA/Associations Health Safety Industry Funds, of which $.20 shall be allocated to the UBCJA National Safety and Health Programs; $.12 allocated to the ACCNJ and FCINJ Industry Funds; and $.02 to INSTALL. The Northeast Carpenters Fund office shall collect and distribute such funds.

## ARTICLE XLIV
## NO OTHER VERBAL AGREEMENTS:

It is expressly understood between the parties hereto that all conditions governing the relationship between the parties are set forth herein and that there are no gentlemen's agreements, or understandings, of any kind supplementary hereto. It is agreed that the parties will meet on a regular basis to discuss the mutual problems of the industry and if necessary, and only by mutual consent of Management and Labor, make any adjustments to this Agreement.

## ARTICLE XLV
## CONTINUING EDUCATION & TRAINING:

1.    The Associations recognize the importance of an educated and productive workforce and as the acting bargaining agents for its present and future employer-members the associations commit to invest in educating its present and future employees.

2.    The Union provides state-of-the art training for its members. With a network of training centers throughout North America, they transfer skills and knowledge from highly-skilled and experienced instructors to union members using cutting-edge curriculum developed at the Carpenters Training Center.

3.    The Union believes in increasing the skills of its members and is committed to providing signatory contractors and craftworkers with a strong competitive advantage in the construction industry.   They consider skill, safety, productivity, and attitude to be the keys to success for their members, their contractors, and the union. Top priority is placed on developing the total professional, Carpenters and Millwrights who are not only technical experts in their craft but who also demonstrate effective communication and leadership qualities. Their education and training contribute to this initiative by highlighting transformational leadership skills, communication and mentoring within their programs and aligning all training with the strategic priorities of growth, skill and professionalism, and organizational effectiveness.

4.    The Associations recognize the Union's commitment to education and training and mutually agree to encourage present and future employer-members to participate in such educational and training programs. In addition, the Association commits to identifying one or more employees from each of their present and future employer members to participate in such education and training programs.

## ARTICLE XLVI
## AGREEMENT AND TERMINATION:

This Agreement shall become effective on the 1st day of May, 2019 and shall terminate on midnight April 30, 2022. At least ninety (90) days prior to the expiration date of this Agreement, either the Union or the Association shall serve upon the other in writing a statement incorporating therein any desired changes in wages, hours of work, working conditions, benefits or any new proposals to be incorporated in a future Collective Bargaining Agreement to become effective subsequent to midnight April 30, 2022. They shall, within thirty (30) days thereafter, make every effort to commence negotiations prior to the termination of this Agreement.

IN WITNESS WHEREOF, we the authorized officers of the Associated Construction Contractors of New Jersey (ACCNJ) and their affiliates, the Northeast Millwright Contractors Association, the Drywall and Interior Systems Contractors Association, Inc. of New Jersey (DISCA), Construction Contractors Labor Employers (CCLE) and the Union have hereunto set forth our hands and seals this _____ day of _____, 2019.

Authorized Management
Bargaining Representatives

Keystone + Mountain + Lakes
Regional Council of Carpenters (KMLRC)


Jack Kocsis, ACCNJ and their Affiliates

William Sproule, Executive Secretary-
Treasurer


Eastern Millwright Regional Council
(EMRC)


Thomas J. Gunning, Northeast Millwright
Contractors Association


Robert Loubier, Executive
Secertary-Treasurer


William Umbach, DISCA

John L. Del Sordi, Senior Regional Manager


Robert Briant, Jr., CCLE

## SCHEDULE "A"
### Keystone + Mountain + Lakes **Regional Council of Carpenters**
### **Wages & Fringe Benefits**
### **Effective May 1, 2019**

Local 253:   Bergen, Essex, Hudson, Passaic Counties
Local 254:   Hunterdon, Mercer, Middlesex, Morris, Somerset, Sussex, Union, Warren
Counties and Parts of Essex County (Short Hills & Millburn)
Local 255:   Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Monmouth,
Ocean, Salem Counties

| | |
|---|---|
| Carpenter Journeyman | $50.43 |
| Carpenter Foreman | 58.00 |
| Carpenter General Forman | 65.56 |
| Vacation Fund | 5.00% (included in rate) |
| Check Off – Carpenter | 4.00% (included in rate) |
| UBC per capita/Job Recovery Fund | 2.00% (included in rate) |
| Welfare Fund | 27.00% |
| Retirement Program (Pension/Annuity) | 28.00% |
| Apprentice Fund | 2.00% |
| UBCJA/Associations | |
| Health Safety Industry Fund | $ .43/hr. |
| Labor Management Fund | $ .15/hr. |

5/1/19   $1.45 INCREASE in wage/benefits plus $.05 for creation of UBC Labor Management Fund, $.05 for creation of CIT Fund and $.05 additional to the ACCNJ and DISCA Industry Advancement funds. (This increase is reflected in the above rates)

5/1/20   $1.45 INCREASE in wage/benefits plus $.05 additional to the ACCNJ and DISCA Industry Advancement funds.

5/1/21   Agreement shall be reopened to negotiate wage/benefits for the final year.

Schedule A/49

**Eastern Millwright Regional Council**
**Wages & Fringe Benefits**

**Effective May 1, 2019**

Local 715:    Statewide

| | |
|---|---|
| Millwright Journeyman | $50.66 |
| Millwright Foreman | 58.26 |
| Millwright General Foreman | 65.86 |
| Vacation Fund | 5.00% (included in rate) |
| Check Off – Millwright | $2.47/hr. (included in rate) |
| Welfare Fund | 28.00% |
| Retirement Program (Pension/Annuity) | 28.00% |
| Apprentice Fund | 2.00% |
| EMRC ATF | $ .05/hr. |
| MWIT | $ .05/hr. |
| CITF/Associations Health Safety | |
|    Industry Funds | $ .33/hr. |
| EMRC Labor Management | $ .50/hr. |

5/1/19   $1.45 INCREASE in wage/benefits plus $.15 for Labor Management/CIT/Association Funds.   (This increase is reflected in the above rates)

5/1/20   $1.45 INCREASE in wage/benefits plus $.05 additional to the Association Advancement funds.

5/1/21   Agreement shall be reopened to negotiate wage/benefits for the final year.

Schedule A/50

**FLOORLAYER LOCAL 251** – covering Bergen, Essex, Hudson, Hunterdon, Mercer, Middlesex, Monmouth, Morris, Ocean, Passaic, Somerset, Sussex, Union and Warren Counties
**Wage & Fringe Benefits**

**Effective May 1, 2019**

| | |
|---|---|
| Carpenter Journeyman | $50.43 |
| Carpenter Foreman | 58.00 |
| Vacation Fund | 5.00% (included in rate) |
| Check Off | 4.00% (included in rate) |
| UBC per capita/Job Recovery Fund | 2.00% (included in rate) |
| Welfare Fund | 27.00% |
| Retirement Program (Pension/Annuity) | 28.00% |
| Apprentice Fund | 2.00% |
| UBCJA/Associations | |
|     Health Safety Industry Funds: | $ .34/hr. |
| Labor Management Fund | $ .15/hr. |

**FLOORLAYER LOCAL 251** – covering Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, and Salem Counties
**Wage & Fringe Benefits**

**Effective May 1, 2019**

| | |
|---|---|
| Carpenter Journeyman | $50.43 |
| Carpenter Foreman | 58.00 |
| Carpenter General Foreman | 65.56 |
| Vacation Fund | 5.00% (included in rate) |
| Check Off | 4.00% (included in rate) |
| UBC per capita/Job Recovery Fund | 2.00% (included in rate) |
| Welfare Fund | 27.00% |
| Retirement Program (Pension/Annuity) | 28.00% |
| Apprentice Fund | 2.00% |
| UBCJA/Associations | |
|     Health Safety Industry Funds: | $ .34/hr. |
| Labor Management Fund | $ .15/hr. |

5/1/19    $1.45 INCREASE in wage/benefits plus $.05 for creation of UBC Labor Management Fund, $.05 for creation of CIT Fund, $.02 for INSTALL and $.03 additional to the ACCNJ and FCINJ Industry Advancement funds. (This increase is reflected in the above rates)

5/1/20    $1.45 INCREASE in wage/benefits plus $.05 additional to the ACCNJ and FCINJ Industry Advancement funds.

5/1/21    Agreement shall be reopened to negotiate wage/benefits for the final year

Schedule A/51

51

**DRYWALL FINISHERS** – Council wide

| | |
|---|---|
| Carpenter Journeyman | $45.39 |
| Carpenter Foreman | 52.20 |
| Carpenter General Foreman | 59.01 |
| Vacation Fund | 5.00% (included in rate) |
| Check Off | 4.00% (included in rate) |
| UBC per capita/Job Recovery Fund | 2.00% (included in rate) |
| Welfare Fund | 27.00% |
| Retirement Program (Pension/Annuity) | 28.00% |
| Apprentice Fund | 2.00% |
| UBCJA/Associations | |
| Health Safety Industry Fund | $ .43/hr. |
| Labor Management Fund | $ .15/hr. |

5/1/19    $1.45 INCREASE in wage/benefits plus $.05 for creation of UBC Labor Management Fund, $.05 for creation of CIT Fund and $.05 additional to the Association Advancement funds. (This increase is reflected in the above rates)

5/1/20    $1.45 INCREASE in wage/benefits plus $.05 additional to the ACCNJ and DISCA Industry Advancement funds.

5/1/21    Agreement shall be reopened to negotiate wage/benefits for the final year

Schedule A/52

# EXHIBIT B



SHORT FORM AGREEMENT
# New Jersey Regional Council of Carpenters
(Formerly "New Jersey State Council of Carpenters")
UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA



WHEREAS, the Contractor is engaged in the building and construction business and desires to employ employees represented by the Local Unions and/or Regional Councils of the United Brotherhood of Carpenters and Joiners of America (hereinafter "Carpenter Unions"), in their respective territorial jurisdictions which employment will require payments to the New Jersey Carpenters Pension Fund, New Jersey Carpenters Health Fund, New Jersey Carpenters Annuity Fund, New Jersey Carpenters Vacation Fund, New Jersey Carpenters Apprentice Training and Educational Fund (hereinafter "Funds") and check-off dues deductions to the various local groups and the Regional Council; **ALL FRINGE BENEFITS ARE TO BE PAID WEEKLY.**

WITNESSETH, the undersigned agrees to be bound by every applicable current collective bargaining agreement between the State Council of Carpenters, Regional Council of Carpenters, or other local Carpenters Unions affiliated with the United Brotherhood of Carpenters and Joiners of America and The Building Contractors Association of New Jersey, governing wages, working conditions and payments to fringe benefit funds, which agreements are incorporated herein by reference. The permanent arbitrator appointed by the Trustees of the Funds shall herein decide all matters concerning wages and benefits and all matters concerning procedural or substantive arbitrability. Notwithstanding any contrary provisions in the above described agreements, the permanent arbitrator is also authorized to hear and decide any and all contractual disputes arising under the grievance and arbitration provisions of those agreements. The Agreements and Declarations of Trust, as amended, governing the above mentioned fringe benefit Funds are agreed to by the parties and incorporated herein by reference. This Agreement shall continue in effect for the duration of the above referenced applicable collective bargaining agreements and shall be deemed renewed on the same basis as the above referenced applicable collective bargaining agreements, whether renewed by renegotiations or otherwise, including any amendments and/or modifications thereto, and shall continue in full force and effect from year to year unless at least 90 days before expiration of the then current collective bargaining agreement either party notifies the other in writing by certified mail, return receipt requested, of cancellation of this Agreement. This agreement shall also govern any corporation, partnership, or sole proprietorship which is deemed to be a controlled entity under the Internal Revenue Code or which is a successor to, joint employer with, or alter ego of the undersigned Contractor. To the extent the undersigned contractor subcontracts any work covered by this Agreement to any subcontractor or other person the Contractor shall be liable for all contributions owing to the above mentioned Funds in the event the subcontractor or person fails to pay contributions to said Funds for employees covered by this or the above referred to Agreement who are employed by the said subcontractor or person.

NEW JERSEY REGIONAL COUNCIL OF CARPENTERS

NAME OF CONTRACTOR: _KBD  Construction  LLC_

_____

MICHAEL CAPELLI, EXECUTIVE SECRETARY-TREASURER

STREET ADDRESS: _118b  Donor  Avenue_

DATE AGREED UPON: _6-6-11_

CITY: _Elmwood Park_   STATE: _NJ_   ZIP CODE: _07407_

TELEPHONE NUMBER: _201 679 2151  or  201 300 0745_

COUNCIL REPRESENTATIVE (SIGN AND PRINT NAME): _Frank Koch_

AUTHORIZED SIGNATURE: _BdJadic_

E-MAIL OF CONTRACTOR: _dbkbd construction @yahoo.com_

NAME OF AUTHORIZED SIGNER (PLEASE PRINT): _Dwan Budinski_

IRS IDENTIFICATION NUMBER OF CONTRACTOR: _20- 271-7978_

TITLE (PLEASE PRINT): _President_

ALL COPIES TO COUNCIL

# EXHIBIT C

NEW JERSEY CARPENTERS PENSION FUND

AMENDED and SUPPLEMENTAL AGREEMENT

and DECLARATION OF TRUST

as of JANUARY 1, 1962

AMENDED and SUPPLEMENTAL AGREEMENT AND DECLARATION of TRUST made as of January 1, 1962 among the NEW JERSEY STATE COUNCIL of CARPENTERS, an unincorporated association of Trade Unions and District Councils affiliated with the UNITED BROTHERHOOD of CARPENTERS and JOINERS of AMERICA, acting for its members, hereinafter known as the UNION and the BUILDING CONTRACTORS ASSOCIATION OF NEW JERSEY, an association of employers in the building construction industry, acting for its members and such additional employers who under collective bargaining agreements are required to make payments to this FUND all being hereinafter known as EMPLOYERS and the TRUSTEES, signatory hereto, who with their successors all being hereinafter known as TRUSTEES.

WHEREAS, the NEW JERSEY STATE COUNCIL OF CARPENTERS PENSION TRUST FUND has been duly established and is operating pursuant to the requirements of the Labor-Management Relations Act, the Internal Revenue Code and all other applicable laws and the Agreement of the parties hereto and the agreement of the parties consenting hereto, such fund to be used in the manner hereinafter set forth.

NOW, THEREFORE, THIS AMENDED and SUPPLEMENTAL AGREEMENT and DECLARATION of TRUST.

person even though said investments would not be legal for Trustees and income derived therefrom, subject to this instrument.

Section 3. All moneys received hereunder by the Trustees shall be deposited by them in such bank or banks as the Trustees designated for that purpose and all withdrawals of moneys from such bank or banks shall be made only by check signed by a person or persons authorized by the Trustees to sign and/or countersign. The Trustees shall have the power to establish a special account in which shall be deposited sufficient funds to defray cost of operation of the Fund, including salaries, fees, benefits and proper claims against the Fund. The Trustees may empower an Agent of the Fund to sign checks drawn against this Special Account.

Section 4. Each Trustee and each person who is authorized to sign and countersign checks and who may be engaged in handling assets, accounts, monies and securities of the Fund shall be bonded pursuant to Law and at the expense of the Fund.

ARTICLE III

COLLECTION OF EMPLOYER CONTRIBUTIONS

Section 1. The Trustees shall have the power to demand, collect, receive and hold Employer contributions and may take such steps including, but without limitation, the institution and prosecution of or the intervention in any proceeding at law, equity, or in bankruptcy, as may be necessary in the Trustees' judgment, for the collection of such Contributions. Such legal proceedings may be in the name of the Fund.

- 6 -

Section 2.  The Trustees shall have the power to require an Employer to furnish such payroll information and reports as they may require in the performance of their duties.  The Trustees or any authorized agent or representative of the Trustees shall have the right during all reasonable business hours to examine and copy such of the pertinent payroll records and payroll governmental reports of the Employer as may be necessary to permit the Trustees to determine whether such Employer is making full payment to the Fund.

Section 3.  The failure of an Employer to pay the contributions required under the Collective Bargaining Agreement when due shall be a violation of the collective bargaining agreement and a violation of the Employer's obligation hereunder.

Non-payment by an Employer of any money due shall not relieve any other Employer from his obligation to make payments. The Trustees and/or the Union shall have the right to compel a delinquent Employer or an Employer whose office is out of the State of New Jersey to post a bond to assure future prompt payments in full.  When the Fund incurs an expense for collection in connection with a delinquent Employer's account, whether same be for accountant's and/or attorney's fees and/or collection agency fees without regard to whether a law suit was instituted, same shall become the obligation of the Employer and shall be added to the amount due plus 6% interest per annum from due date to date of payment.  The Trustees may waive or compromise the interest and expenses provided herein in cases of default.

- 7 -

NEW JERSEY CARPENTERS WELFARE FUND
AMENDED and SUPPLEMENTAL AGREEMENT
and DECLARATION OF TRUST
as of JANUARY 1, 1962.

AMENDED and SUPPLEMENTAL AGREEMENT and DECLARATION of TRUST made as of January 1, 1962 among the NEW JERSEY STATE COUNCIL of CARPENTERS, an unincorporated association of Trade Unions and District Councils affiliated with the UNITED BROTHERHOOD of CARPENTERS and JOINERS OF AMERICA, acting for its members, hereinafter known as the UNION and the BUILDING CONTRACTORS ASSOCIATION of NEW JERSEY, an association of employers in the building construction industry, acting for its members, and such additional employers who under collective bargaining agreements are required to make payments to this FUND all being hereinafter known as EMPLOYERS and the TRUSTEES, signatory hereto, who with their successors all being hereinafter known as TRUSTEES.

WHEREAS, the NEW JERSEY CARPENTERS WELFARE FUND has been duly established and is operating pursuant to the requirements of the Labor-Management Relations Act, the Internal Revenue Code and all other applicable laws and the Agreement of the parties hereto and the agreement of the parties consenting hereto, such fund to be used in the manner hereinafter set forth,

NOW, THEREFORE, THIS AMENDED and SUPPLEMENTAL AGREEMENT and DECLARATION OF TRUST,

- 1 -

Trustees shall have the power to establish a special account in which shall be deposited sufficient funds to defray cost of operation of the Fund, including salaries, fees, benefits and proper claims against the Fund. The Trustees may empower an Agent of the Fund to sign checks drawn against this Special Account.

Section 6. Each Trustee and each person who is authorized to sign and countersign checks and who may be engaged in handling assets, accounts, monies and securities of the Fund shall be bonded pursuant to Law and at the expense of the Fund.

ARTICLE III

COLLECTION OF EMPLOYER CONTRIBUTIONS

Section 1. The Trustees shall have the power to demand, collect, receive and hold Employer contributions and may take such steps including, but without limitation, the institution and prosecution of or the intervention in any proceeding at law, equity, or in bankruptcy, as may be necessary in the Trustees' judgment, for the collection of such Contributions. Such legal proceedings may be in the name of the Fund.

Section 2. The Trustees shall have the power to require an Employer to furnish such payroll information and reports as they may require in the performance of their duties. The Trustees or any authorized agent or representative of the Trustees shall have the right during all reasonable business hours to examine and copy such of the pertinent payroll records and payroll governmental reports of the Employer as may be necessary to permit the Trustees to determine whether such Employer is making full payment to the Fund.

- 7 -

AGREEMENT and DECLARATION of TRUST

Creating and Establishing the

NEW JERSEY CARPENTERS ANNUITY FUND


AGREEMENT and DECLARATION of TRUST made as of May 1, 1982 among the NEW JERSEY STATE COUNCIL of CARPENTERS, an unincorporated association of Unions and District Councils affiliated with the UNITED BROTHERHOOD of CARPENTERS and JOINERS of AMERICA, acting for its members, hereinafter known as the UNION, and the BUILDING CONTRACTORS ASSOCIATION of NEW JERSEY, an association of employers in the building construction industry, hereinafter known as the ASSOCIATION, acting for its members, and such additional employers who under collective bargaining agreements are required to make payments to this ANNUITY FUND, all being hereinafter known as EMPLOYERS and the TRUSTEES, signatory hereto, who with their successors, all herein after known as TRUSTEES.

WHEREAS, the UNION and the EMPLOYERS have entered into collective bargaining agreements which require ANNUITY PAYMENTS by the EMPLOYERS, for the purpose of providing an ANNUITY PLAN; and

WHEREAS, to effectuate the aforesaid purpose it is desired to establish a trust fund for annuity benefits, all pursuant to the requirements of the Labor-Management Relations Act, and all other applicable laws, and the agreement of the Parties, such fund to be used as hereinafter set forth.

NOW, THEREFORE, THIS AGREEMENT and DECLARATION of TRUST,

ARTICLE VIII

Miscellaneous Provisions

Section 8.01   Each EMPLOYER shall promptly furnish to the TRUSTEES on demand any all records of his EMPLOYEES concerning the classifications of such EMPLOYEES, their names, social security numbers, the amount of wages paid and hours worked, place of employment and any and all other payroll records and information that the TRUSTEES may require in connection with the administration of the ANNUITY FUND and for no other purpose.  Each EMPLOYER shall also submit in writing to the TRUSTEES at such regular periodic intervals and in such form as the TRUSTEES may establish such of the above data and information as may be requested by the TRUSTEES.

Section 8.02   No EMPLOYEE nor any person claiming by or through such EMPLOYEE shall have any right, title or interest in or to the assets of the ANNUITY FUND or any part thereof,  except as specifically provided in this TRUST AGREEMENT and in the ANNUITY PLAN adopted by the TRUSTEES.  Each EMPLOYEE'S rights to any moneys shall be subject to such reasonable rules and regulations as the TRUSTEES may adopt under which such rights shall be subject to forfeiture.  All forfeitures shall only be used for the purposes of the ANNUITY FUND and shall not increase any EMPLOYEE benefit.

Section 8.03   No moneys, property, equity or interest of any nature whatsoever in the ANNUITY FUND, or benefits or moneys payable therefrom shall be subject in any manner, by an EMPLOYEE or person claiming through such EMPLOYEE, to anticipation, alienation, sale, transfer assignment, pledge, encumbrance, garnishment, mortgage

## AGREEMENT and DECLARATION of TRUST
### Creating and Establishing the
### NEW JERSEY CARPENTERS VACATION FUND

AGREEMENT and DECLARATION of TRUST made as of May 1, 1969 among the NEW JERSEY STATE COUNCIL of CARPENTERS, an unincorporated association of Trade Unions and District Councils affiliated with the UNITED BROTHERHOOD of CARPENTERS and JOINERS of AMERICA, acting for its members, hereinafter known as the UNION, and the BUILDING CONTRACTORS ASSOCIATION of NEW JERSEY, an association of employers in the building construction industry, hereinafter known as the ASSOCIATION, acting for its members and such additional employers who under collective bargaining agreements are required to make payments to this FUND, all being hereinafter known as EMPLOYERS and the TRUSTEES, signatory hereto, who with their successors, all herein after known as TRUSTEES.

WHEREAS, the Union and the Employers have entered into collective bargaining agreements which require vacation payments by the Employers, for the purpose of providing a vacation plan; and

WHEREAS, to effectuate the aforesaid purpose it is desired to establish a trust fund for vacation benefits, all pursuant to the requirements of the Labor-Management Relations Act, and all other applicable law, and the Agreement of the Parties, such fund to be used as hereinafter set forth.

NOW, THEREFORE, THIS AGREEMENT and DECLARATION of TRUST, WITNESSETH:

That, in consideration of the premises and to create said trust, to be known as NEW JERSEY CARPENTERS VACATION FUND, it is agreed:

- 1 -

ployers and with the union. An audit by a certified public accountant shall be deemed compliance with this provision. The Union, the Employers and the Employees shall be deemed to have approved any such account, unless there shall be filed with the Trustees within sixty (60) days after receipt of such account, written objection thereto, and in the absence of such objections the Trustees shall be released, relieved and discharged with respect to all matters and things set forth in such account as though the same had been settled by the decree of a court of competent jurisdiction.

Section 13. The Trustees shall administer the Fund in conformity with this Agreement, as from time to time amended, and with the requirements of the Labor-Management Relations Act and the Internal Revenue Code, as from time to time amended, and with all other applicable laws.

ARTICLE V

Collection of Vacation Payments

Section 1. Each Employer shall pay to the Fund the Vacation Payments required by the Collective Bargaining Agreement. The Vacation Payments shall be subject to amendment in any manner hereafter agreed upon by the Employers and the Union and set forth in the Collective Bargaining Agreement. The Employers shall make payments, accompanied by a report, promptly for each period specified by the Fund or by the Collective Bargaining Agreement. The report shall be complete in all details. The Trustees may at any time audit or cause to be audited the pertinent records of any Employer in connection with the above. In the event such audit discloses that there

- 15 -

... moneys due to the Fund, the Employer shall pay the cost of the audit.

Section 2. The Trustees shall have the power to demand, collect and receive contributions and shall hold such moneys as part of the Fund for the purposes specified in this Agreement.

Section 3. The failure of an Employer to pay the Vacation Payments promptly when due shall be a violation of the Collective Bargaining Agreement as well as a violation of the Employer's obligations hereunder. Non-payment by an Employer of any money due shall not relieve any other Employer from his obligation to make payments. In addition to any other remedies to which the parties may be entitled an Employer in default for ten working days shall be obligated to pay liquidated damages computed as interest at the rate of 10% per annum on the moneys due to the Fund from the date when the payment was due to the date when the payment is made, together with all expenses of collection, including attorneys' and accountants' fees and collection expenses, even though no legal actions are actually instituted, incurred by the Fund, plus such security as may be required by the Trustees.

Section 4. In addition to any other enforcement remedies which may exist under the Collective Bargaining Agreement and this Agreement, the Trustees may take whatever proceedings in the name of the Fund that may be proper in their discretion for enforcement of Employer payments including an action of debt and accounting.

- 16 -

AGREEMENT and DECLARATION of TRUST
Creating and Establishing the
NEW JERSEY CARPENTERS' APPRENTICE
TRAINING AND EDUCATIONAL FUND

AGREEMENT and DECLARATION of TRUST made as of November, 1969 among the NEW JERSEY STATE COUNCIL OF CARPENTERS, an unincorporated association of Trade Unions and District Councils affiliated with the UNITED BROTHERHOOD of CARPENTERS and JOINERS of AMERICA, acting for its members, hereinafter known as the UNION, and the BUILDING CONTRACTORS ASSOCIATION of NEW JERSEY, an association of employers in the building construction industry, hereinafter known as the ASSOCIATION, acting for its members and such additional employers who under collective bargaining agreements are required to make payments to this FUND, all being hereinafter known as EMPLOYERS and the TRUSTEES, signatory hereto, who with their successors, all hereinafter known as TRUSTEES.

WHEREAS, the Union and the Employers have entered into collective bargaining agreements which require payments by the Employers to an Apprentice Training and Educational Fund; and

WHEREAS, to effectuate the aforesaid purpose it is desired to establish a trust fund pursuant to the require-ments of Labor-Management Relations Act, and all other

ployers and with the Union.  An audit by a certified public accountant shall be deemed compliance with this provision.  The Union, the Employers and the Employees shall be deemed to have approved any such account, unless there shall be filed with the Trustees within sixty (60) days after receipt of such account, written objection thereto, and in the absence of such objections the Trustees shall be released, relieved and discharged with respect to all matters and things set forth in such account as though the same had been settled by the decree of a court of competent jurisdiction.

Section 13.  The Trustees shall administer the Fund in conformity with this Agreement, as from time to time amended, and with the requirements of the Labor-Management Relations Act and the Internal Revenue Code, as from time to time amended, and with all other applicable laws.

## ARTICLE V
## Collection of Fund Payments

Section 1.  Each Employer shall pay to the Fund the Fund Payments required by the Collective Bargaining Agreement.  The Fund Payments shall be subject to amendment in any manner hereafter agreed upon by the Employers and the Union and set forth in the Collective Bargaining Agreement.  The Employers shall make payments, accompanied by a report, promptly for each period specified by the Fund or by the Collective Bargaining Agreement.  The report shall be complete in all details.  The Trustees may at any time audit or cause to be audited the pertinent records of any Employer in connection with the above.  In the event such audit discloses that there

are monies due to the Fund, the Employer shall pay the cost of the audit.

**Section 2.** The Trustees shall have the power to demand, collect and receive contributions and shall hold such moneys as part of the Fund for the Purposes specified in this Agreement.

**Section 3.** The failure of an Employer to pay the Fund Payments promptly when due shall be a violation of the Collective Bargaining Agreement as well as a violation of the Employer's obligations hereunder. Non-payment by an Employer of any money due shall not relieve any other Employer from his obligation to make payments. In addition to any other remedies to which the parties may be entitled an Employer in default for ten working days shall be obligated to pay liquidated damages computed as interest at the rate of 10% per annum on the moneys due to the Fund from the date when the payment was due to the date when the payment is made, together with all expenses of collection, including attorneys' and accountants' fees and collection expenses, even though no legal actions are actually instituted, incurred by the Fund, plus such security as may be required by the Trustees.

**Section 4.** In addition to any other enforcement remedies which may exist under the Collective Bargaining Agreement and this Agreement, the Trustees may take whatever proceedings in the name of the Fund that may be proper in their discretion for enforcement of Employer payments including an action of debt and accounting.

-16-

# EXHIBIT D

**STATE OF NEW JERSEY**

In the Matter of the Arbitration         :

                                           :        **Before:  J. J. PIERSON, Esq.**

between                       :                **Permanent Arbitrator**

                                           :

**EASTERN ATLANTIC STATES CARPENTERS:**
**BENEFIT FUNDS[1]**                     :
      (hereinafter "EASCF" or "Funds")   :

                                           :        **AWARD and AUDIT ORDER**

-and-                         :

                                         :

**KBD CONSTRUCTION LLC**          :
      (hereinafter "Employer")       :

                                         :

This matter being opened to J. J. PIERSON, Esq., Permanent Arbitrator designated by the EASCF Trustees, and a hearing having been held on October 26, 2023 through the offices of Eastern Atlantic States Carpenters Funds, conducted at the Law Offices of Kroll, Heineman, Ptasiewicz & Parsons, Edison, New Jersey and by video conference, after due notice of the hearing was issued to the Employer, and Bradley Parsons, Esq. appearing for the EASCF (together with Steve Schaeffer, Arman Razvi and Jacob Madrid, Collectors) and no one appearing for the Employer, it is established that the Employer is bound to a Collective Bargaining Agreement ("Agreement") with the Eastern Atlantic States Regional Council of Carpenters ("Regional Council"[2]); and

Pursuant to Article XXXII of the Agreement ("<u>Fringe Benefit Funds</u>"), a signatory employer acknowledges the effective Funds (inclusive of predecessors New Jersey Carpenters Welfare and Pension/Annuity Funds, the New Jersey Carpenters Apprentice Training and Education Fund, the New Jersey Carpenters Contractors Trust (NJCCT), UBCJ Health & Safety Fund,  and Vacation Fund); recognizes the obligation to remit fringe benefit contributions in amounts set forth in Appendix "A" of the Agreement; and explicitly and expressly agrees to all the terms and condition of the Agreement and Declarations of Trust governing the Funds and Plans relating to each Fund; and

---

1. As successor to the Northeast Carpenters Funds.

2. As successor to the Keystone Mountain Lakes Regional Council of Carpenters.

The Agreement further addresses the rights of the Funds in seeking delinquent contributions from employers, pursuant to Article XXVI:

> 2. The Trustees of the respective Funds shall maintain appropriate actions in law or in equity, to collect the proper amount of contributions due, for an accounting of, or for any other appropriate relief. Should legal action be required in order to effect collection of the money owed by the Contractor, or to effect an examination of his books and records, the Contractor shall be responsible, in addition to the money owed, for attorney's fee and disbursements incurred, court costs, plus interest at the rate of twelve (12%) per annum on money, even though actual legal proceeding shave not been begun.
>
> . . . .
>
> 4. It is further agreed that the Trustees of any Fringe Benefit Fund or an alleged delinquent employer may request arbitration of any alleged wage or fringe benefit fund delinquencies and arbitration must be heard within thirty (30) days after such request. The decision of the arbitrator shall be final and binding. The arbitration shall be heard in the offices or the applicable Carpenter Funds or in the office of counsel for the Funds and shall be in accordance with the rules of the New Jersey State Board of Mediation. In order to expedite such hearing, a Permanent Arbitrator is herewith designated and approved. Said Permanent Arbitrator is J. J. Pierson. The Permanent Arbitrator shall serve for a period of one year and shall be subsequently reappointed yearly thereafter upon affirmative vote of the Fund Trustees.

Herein, the Funds allege that the Employer is, and was, delinquent in making timely and accurate contributions to the EASCF, as required, on behalf of individuals employed under the Agreement; and

The Funds directed Counsel to pursue collection of the delinquent contributions, by submitting the matter to arbitration in accordance with the Agreement.

Thereafter, the Funds requested the Arbitrator to make a Finding of Fact as to the obligation of the Employer to make benefit fund contributions and to issue an Award and Order requiring the Employer to make payment of the delinquent/deficient contributions.

In addition, the Funds requested the Arbitrator to direct the Employer to post a surety bond, as permitted, pursuant to Article XXVI, Paragraph 3, which states:

3. The Trustees of the respective Funds may require an Employer with a record of delinquencies or an Employer with no previous record of payments to the fringe benefit funds, to post a surety bond obtained from a carrier licensed to do business in the State of New Jersey or cash escrow with the Trustees prior to the commencement of any work by said Trustees but not less than $5,000.00 and must guarantee the payment of Fringe Benefit payments required under this Agreement to all employees within the unit. A copy of such bond shall be furnished to the Union before the commencement or re-commencement of any work by such employees, or the escrow furnished.

Based on the record presented, this Arbitrator herein **FINDS** that:

The Employer is delinquent in payment of fringe benefit contributions to the EASCF and in violation of its obligations under the Agreement, **for the payroll period of July 1, 2023 through September 30, 2023 in the amount of $12,293.10**.

It is therefore **AWARDED and ORDERED** that:

1. The Employer, **KBD CONSTRUCTION LLC** shall make the Funds whole, and pay forthwith, the principal amount of **$12,293.10 for the payroll period of July 1, 2023 through September 30, 2023** plus interest in the amount of **$123.34**; and liquidated damages in the amount of **$2,458.62**.

2. The Employer shall pay reasonable attorneys' fee, forthwith, to the law firm of Kroll Heineman Ptasiewicz Parsons, 91 Fieldcrest Avenue, Suite 35, Edison, New Jersey 08837 in the sum of **$2,765.94,** which is 22.5% of the principal amount or 22.5% of the adjusted amount shown to be due by the audit ordered herein, plus interest at the rate of 10% from the date of this Award on any part of the attorneys' fees awarded and ordered that is not paid within 30 days of the date of this Award.

3. In accordance with the provisions of the Agreement, the Employer shall reimburse the Funds for the Arbitrator's fee of **$800.00**. Payment by the Employer, of the Arbitrator's fee shall be deemed an obligation imposed by this Award.

4. The Employer, **KBD CONSTRUCTION LLC** is liable to the EASCF in this matter in the total amount of **$18,241.00**, as specifically set forth in paragraphs 1-3 above. A check shall be made payable to the **"Eastern Atlantic States Carpenters Funds"** and forwarded to "Raritan Plaza II, P. O. Box 7818, Edison, NJ 08818-7818"; and a copy of the check shall be forwarded to the Funds' Counsel: "KROLL, HEINEMAN, PTASIEWICZ & PARSONS" 91 Fieldcrest Avenue, Suite 35, Edison, New Jersey 08837.

5. The Employer shall remain obligated to the Funds, specifically for adhering to the terms and condition of the Agreement and for submitting future contributions to the Funds in a timely manner; and

6. The Trustees of the Funds, in their discretion and upon notice pursuant to Article XXVII, Section 3, may require and direct the Employer to post a surety bond obtained from a carrier licensed to do business in the State of New Jersey, or cash escrow with the Trustees, in an amount determined by the Trustees, but not less than $50,000.00, to guarantee the payment of Fringe Benefit payments required under this Agreement for all employees within the unit.

7. The Trustees of the Funds, in their discretion, shall cause an audit to be made of the payrolls and such other records of the Employer as are considered pertinent by the Trustees to determine the accuracy of information relating to the jobs and periods involved; and the Employer shall cooperate in the performance of said audit to determine the amount of benefit contributions owed, if any, to the Funds; and

8. In addition to paying the full Award amount, as forth in paragraph 4 above, within fourteen (14) days of receipt of the within Award and Order, the Employer shall submit the following documents to the auditor:

A. Bank accounts;
B. Federal and state tax returns;
C. Financial statements;
D. Documents evidencing ownership interest in real estate, motor vehicle, any and all equipment, pension, life or profit sharing plans, stocks, bonds, securities or other tangible goods;
E. Payroll records, accounts receivables and accounts payables;
F. Any judgments or liens by or against the Employer;
G. Any and all loans, promissory notes, bills of exchange or commercial paper made by or for the benefit of the Employer; and
H. Any and all other documents deemed relevant in determining the financial status of the Employer by the Trustees of the Funds.

9. The Employer shall be responsible for costs relating to the audit, including: the cost and fees of the auditor; legal fees; and further fees of the Arbitrator, if services are necessary; and

10. In the event it is necessary for the Trustees of the Funds to enforce this ORDER in court, the Employer shall be responsible for all court costs including, but not limited to, the filing fee of $400.00.

Dated:  October 31, 2023

_____
**J. J. PIERSON, Esq., ARBITRATOR**

COMMONWEALTH OF PENNSYLVANIA:
     ss.
COUNTY OF NORTHAMPTON :

I, J. J. PIERSON, Esq., on my oath, do attest and affirm to being the person who has executed the foregoing instrument and issued the above AWARD and ORDER on October 31, 2023

_____
J. J. Pierson, Attorney at Law - State of New Jersey